LORETTA F. JOHNSON, Respondent, *v.* THE CITY OF NEW YORK et al., Appellants, Impleaded with Others.

In the Matter of JOHN E. BOWE et al., Appellants, against S. HOWARD COHEN et al., Constituting the Board of Elections of the City of New York et al., Respondents.

DAVID H. KNOTT, as Chairman of the County Committee of the Democratic Party of the County of New York, et al., Appellants.

JOHN R. CREWS, as Chairman of the County Committee of the Republican Party of the County of Kings, et al., Respondents.

(Argued April 26, 1937; decided June 2, 1937.)

412

Paul Windels, Corporation Counsel (William C. Chanler, Frederick vP. Bryan and Seymour B. Quel of counsel), for appellants in action. The election of city Councilmen by the system of proportional representation does not violate any provision of the State Constitution. (Matter of Hopper v. Britt, 203 N. Y. 144; Spitzer v. Village of Fulton, 172 N. Y. 285; Dougherty, Constitutional History of New York State, pp. 93–96; Lincoln, Constitutional History of New York, vol. 1, pp. 640–652; Board of Education v. Woodworth, 89 Okla. 192; Warren v. Pim, 66 N. J. Eq. 353.) If there is any inconsistency between the provisions of chapter 43 and section 1 of article II of the Constitution, then to that extent the latter section has been modified by the Home Rule Amendment to the Constitution. (Bareham v. City of Rochester, 246

N. Y. 140; *Spitzer* v. *Village of Fulton*, 172 N. Y. 285.) An act cannot be judicially declared to be beyond the power of the Legislature to enact unless one be able to point specifically to some provision of the Constitution which is in conflict with it. (*Cleveland* v. *City of Watertown*, 222 N. Y. 159.)

*Walter M. Weis* and *Michael Potter* for City Fusion Party, *amicus curiæ*, in action. Chapter 43 of the new charter of the city of New York is constitutional. (*Matter of Mooney* v. *Cohen*, 272 N. Y. 33; *Matter of Osborn* v. *Cohen*, 272 N. Y. 55; *Matter of Tierney* v. *Cohen*, 268 N. Y. 464.) Chapter 43 of the charter is constitutional under the Home Rule Amendment. Therefore, even if it could be held to conflict with an earlier provision of the Constitution, this would be immaterial and no bar to its validity. (*Matter of Mooney* v. *Cohen*, 272 N. Y. 33; *Bareham* v. *City of Rochester*, 246 N. Y. 140.)

*Edward S. Moran, Jr.*, for respondent in action. Chapter 43 of the new charter is in conflict with and in contravention of section 1 of article II of the State Constitution. (*Wattles ex rel. Johnson* v. *Upjohn*, 211 Mich. 514; *People* v. *Elkus*, 59 Cal. App. 396; *State* v. *Constantine*, 42 Ohio St. 437; *Opinion to the House of Representatives* 21 R. I. 579; *McArdle* v. *Jersey City*, 66 N. J. L. 590; *Bowden* v. *Bedell*, 68 N. J. L. 451; *Rathbone* v. *Wirth*, 6 App. Div. 277; 150 N. Y. 459; *People ex rel. Woods* v. *Crissey*, 91 N. Y. 616.) Chapter 43 of the new charter is in conflict with and in contravention of section 3 of article XII of the State Constitution. (*People* v. *Elkus*, 59 Cal. App. 396; *State* v. *Constantine*, 42 Ohio St. 437; *Reutener* v. *City of Cleveland*, 107 Ohio St. 117; *Bareham* v. *City of Rochester*, 246 N. Y. 140.) Chapter 43 of the new charter is in conflict with section 1 of article I and section 1 of article II of the State Constitution and the Fourteenth Amendment of the Constitution of the United States. (*Matter of Hopper* v. *Britt*, 203 N. Y. 144.) Chapter 43 of the new charter is in conflict with and in contravention

of sections 4 and 14 of the City Home Rule Law (Cons. Laws, ch. 76). (*Bareham* v. *City of Rochester*, 246 N. Y. 140; *Matter of Mooney* v. *Cohen*, 272 N. Y. 33.)

*Abraham S. Gilbert, Jackson A. Dykman* and *Alfred J. Callahan* for appellants in proceeding. Chapter 43 violates section 1 of article I and section 1 of article II of the State Constitution, and is void. (*People ex rel. Deister* v. *Wintermute*, 194 N. Y. 99; *People ex rel. Dietz* v. *Hogan*, 214 N. Y. 216; *Needleman* v. *Voorhis*, 254 N. Y. 339; *People ex rel. Goring* v. *President of Vil. of Wappinger's Falls*, 144 N. Y. 616; *Matter of Callahan*, 200 N. Y. 59; *Matter of Hopper* v. *Britt*, 203 N. Y. 144; *People ex rel. Angerstein* v. *Kenney*, 96 N. Y. 294; *Penn. R. R. Co.* v. *International Coal Mining Co.*, 230 U. S. 184; *United States* v. *Alexander*, 79 U. S. 177; *People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367; *Story* v. *Craig*, 231 N. Y. 33; *Matter of LaRocca* v. *Flynn*, 257 N. Y. 5.) Chapter 43 invades the constitutional election to constitutional office, and is void. (*People ex rel. Woods* v. *Crissey*, 91 N. Y. 616; *People ex rel. Howard* v. *County of Erie*, 42 App. Div. 510; 160 N. Y. 687; *People ex rel. Deitz* v. *Hogan*, 214 N. Y. 216; *Needleman* v. *Voorhis*, 254 N. Y. 339; *People ex rel. Ward* v. *Scheu*, 167 N. Y. 292; *Matter of Burke* v. *Cohen*, 265 N. Y. 210.) Chapter 43 is a lottery, and is unconstitutional and void. (*Wattles ex rel. Johnson* v. *Upjohn*, 211 Mich. 514; *Matter of Hopper* v. *Britt*, 203 N. Y. 144.) Voting by proportional representation is unconstitutional. (*Maynard* v. *Board*, 84 Mich. 228; *Wattles ex rel. Johnson* v. *Upjohn*, 211 Mich. 514; *Brown* v. *Smallwood*, 130 Minn. 492; *McArdle* v. *Mayor*, 66 N. J. L. 590; *Bowden* v. *Bedell*, 68 N. J. L. 451; *People* v. *Elkus*, 59 Cal. App. 396; *Opinion to House of Representatives*, 21 R. I. 579; *State* v. *Constantine*, 42 Ohio St. 437; *Reutener* v. *City*, 107 Ohio St. 117.)

*William J. O'Shea, Jr., John T. Dooling, Francis D. McGarey, Walter A. Lynch, Sydney Rosenthal* and *Walter A. Smith,* for interveners-appellants in proceeding. Chapter

43 invades the franchises of members of the State and the rights of voters under the Constitution and under settled principles having to do with fair elections. (*Matter of Burke* v. *Terry,* 203 N. Y. 293; *People ex rel. Hotchkiss* v. *Smith,* 206 N. Y. 231; *Matter of Gage,* 141 N. Y. 112; *People ex rel. Goring* v. *President of Vil. of Wappinger's Falls,* 144 N. Y. 616; *Matter of Callahan,* 200 N. Y. 59; *Matter of Hopper* v. *Britt,* 203 N. Y. 144; *Maynard* v. *Board,* 84 Mich. 228; *Brown* v. *Smallwood,* 130 Minn. 492; *Wattles ex rel. Johnson* v. *Upjohn,* 211 Mich. 514; *McArdle* v. *Mayor,* 66 N. J. L. 590; *People* v. *Elkus,* 59 Cal. App. 396; *Opinion to House of Representatives,* 21 R. I. 579; *State* v. *Constantine,* 42 Ohio St. 437; *Reutener* v. *Cleveland,* 107 Ohio St. 117; *People* v. *Home Ins. Co.,* 92 N. Y. 328; *People ex rel. Einsfeld* v. *Murray,* 149 N. Y. 367.) Chapter 43 is unconstitutional in that it does not create the offices of Councilmen or fix their number, and in that the system it seeks to set up is indefinite and uncertain and unfair to the voters. (*Matter of Gage,* 141 N. Y. 112; *Matter of Burke* v. *Cohen,* 265 N. Y. 210; *People* v. *Conover,* 17 N. Y. 64; *Eckerson* v. *City of New York,* 80 App. Div. 12; 176 N. Y. 609; *Meyers* v. *Mayor,* 69 Hun, 291; *Miller* v. *Warner,* 42 App. Div. 208; *Matter of Heeran* v. *Scully,* 254 N. Y. 344; *Barto* v. *Himrod,* 8 N. Y. 483; *People ex rel. Percival* v. *Cram,* 164 N. Y. 166; *People ex rel. Unger* v. *Kennedy,* 207 N. Y. 533; *Matter of McCabe* v. *Voorhis,* 243 N. Y. 401.)

*Paul Windels, Corporation Counsel (William C. Chanler, Frederick vP. Bryan* and *Seymour B. Quel* of counsel), for defendants, respondents, in proceeding. The functional objections to chapter 43 do not violate any provision of the Constitution. (*Matter of Hopper* v. *Britt,* 203 N. Y. 144.) No provision of law or of the Constitution is violated by basing the number of Councilmen to be elected from each borough upon the number of valid votes cast. (*Matter of Mooney* v. *Cohen,* 272 N. Y. 33; *Cleveland* v. *City of Watertown,* 222 N. Y. 159.)

*A. David Benjamin* and *Gabriel L. Kaplan* for interveners-respondents in proceeding. The statute is constitutional. (*Matter of Hopper* v. *Britt*, 203 N. Y. 144.)

*Albert S. Bard, Samuel H. Ordway, Jr., Bertha Rembaugh, Ira S. Robbins, Samuel D. Smoleff, Laurence Arnold Tanzer, Louis Waldman, George H. Hallett, Jr.,* and *Wallace S. Sayre* for Citizens Union of the City of New York et al., *amici curiæ,* in proceeding. The system of proportional representation does not violate section 1 of article II of the Constitution. That section was designed to effect equality of voting privilege. Proportional representation promotes such equality. (*Rathbone* v. *Wirth,* 150 N. Y. 459; *Demarest* v. *Wickham,* 63 N. Y. 320; *People ex rel. Watkins* v. *Perley,* 80 N. Y. 624; *People ex rel. Woods* v. *Crissey,* 91 N. Y. 616; *People ex rel. Angerstein* v. *Kenney,* 96 N. Y. 294; *Reutener* v. *Cleveland,* 107 Ohio St. 117; *Hile* v. *Cleveland,* 107 Ohio St. 144; 266 U. S. 582.)

*Thomas D. Thacher, amicus curiæ* (*David E. Austen* of counsel) in proceeding. The provisions of chapter 43 of the new charter are constitutional. (*Matter of Mooney* v. *Cohen,* 272 N. Y. 33.)

CRANE, Ch. J. The people of the city of New York, at the general election in 1936, declared by their votes on the question submitted that they wanted proportional representation in the election of Councilmen. This was chapter 43 of the proposed new charter also approved at said election. This declared will of the people has been challenged as unconstitutional, and so decided by a Special Term of the Supreme Court held in Kings county. A Special Term held in New York county has declared it constitutional.

The proposition before us may be stated in the following way:

Assuming that the borough of Brooklyn is entitled to twelve Councilmen, it is conceded by everybody that the

borough could be divided into twelve districts, and one Councilman elected from each district. This would give Brooklyn twelve representatives in the Council, and yet the people of Brooklyn had only voted for one out of the twelve. This is said to be legal, and this is the method insisted upon by the opponents of proportional voting. Remove the artificial lines creating the districts, and give Brooklyn the same twelve men in the Council, it is said to be illegal if the people can only vote for one of the twelve. What is the magic in these artificial lines that creates such a difference in result with little or no difference in principle? If the borough be divided into districts the people can only vote for one of the twelve; if the district lines be removed they cannot vote for one of the twelve but must vote for all twelve. The only reason pressed upon us for this artificial distinction is that the Constitution says it must be, and this is final. I can find no such command in the State Constitution, and the authorities, so far as the matter has come into court, and the practice in electing Supervisors and Aldermen, the predecessors of Councilmen, in New York city for over thirty years, has been to the contrary.

The State Constitution of 1821 did not give free and universal suffrage; neither did the laws preceding this Constitution. There were property qualifications entitling one to vote. This Constitution of 1821 reluctantly let go of this property qualification, as can be readily seen from the record of the debates. The voter was qualified if he had paid a tax assessed upon real or personal property or was exempted by law or had performed military duty or had been assessed to labor upon the public highways, and had performed such labor. Such an one was entitled to vote in the town or ward where he actually resided for all officers " that now are, or hereafter may be, elective by the people."

These restrictions upon voting are to be found in article II, section 1, of the Constitution of 1821.

The Constitution of 1826 amended this article and section by removing completely all disqualification of voters. The qualifications of being a taxpayer or of rendering public service were removed, the amended section reading as follows: " Every male citizen of the age of twenty-one years, who shall have been an inhabitant of this State one year next preceding any election, and for the last six months a resident of the county where he may offer his vote, shall be entitled to vote in the town or ward where he actually resides, and not elsewhere, for all officers that now are or hereafter may be elective by the people."

No one can read the history of these changes in the early Constitution without realizing that the object of the change in the law made by these two Constitutions was to remove the disqualifications which attached to the person of the voter. Poverty was no longer to disqualify any male citizen over twenty-one years of age who had resided a sufficient length of time within the State and territory where he voted. The special class of electorate was abolished and all were treated on an equality.

This amendment of the Constitution of 1826 remains in the present Constitution of the State, with a few minor changes, as follows: In the Constitution of 1846 the words " shall be entitled to vote in the town or ward where he actually resides " were changed to " shall be entitled to vote at such election in the election-district of which he shall at the time be a resident." I may add that the amendments to the Constitution of 1864 and 1874 made no changes in these qualifications. The present Constitution embodies all these changes but adds nothing and takes nothing away from the Constitution of 1826 upon the point which we are considering. It reads:

Art. II, § 1: " Every citizen of the age of twenty-one years, who shall have been a citizen for ninety days, and an inhabitant of this State one year next preceding an election, and for the last four months a resident of the

county and for the last thirty days a resident of the election district in which he or she may offer his or her vote, shall be entitled to vote at such election in the election district of which he or she shall at the time be a resident, and not elsewhere, for all officers that now are or hereafter may be elective by the people, and upon all questions which may be submitted to the vote of the people * * *."

So much for the Constitution. The early laws relating to elections, so far as pertinent here, may be referred to. Chapter 61, Laws of 1801, provided: "That all elections for governor, lieutenant governor, senators and members of assembly shall be by ballot, and that such elections shall be held in the cities of New York, Albany, and Schenectady by wards, and in all other parts of this State by towns * * *." This method of voting was changed by the Laws of 1842, chapter 130, title II, section 12: "The elections in the several cities and towns shall be by election districts." This preceded the change that the voter must live in his election district, made by the Constitution of 1846.

These various provisions of the Constitution were before this court in *Spitzer* v. *Village of Fulton* (172 N. Y. 285), where property qualifications were placed upon the right of a voter to vote upon a proposition to establish a system of water works at village expense. The contention was that the statute placing upon the voters these restrictions was unconstitutional because it was in conflict with the provisions of section 1 of article II of the State Constitution, which is quoted above. This court said: "The obvious purpose of that article was to prescribe the general qualifications that voters throughout the State were required to possess to authorize them to vote for public officers or upon public questions relating to general governmental affairs. But we are of the opinion that that article was not intended to define the qualifications of voters upon questions relating to the financial interests

or private affairs of the various cities or incorporated villages of the State, especially when, as in this case, it relates to borrowing money or contracting debts. This becomes manifest when we also consider section 1 of article 12 of the Constitution which provides: ' It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments, and in contracting debt by such municipal corporations.' Article two must be construed in connection with article twelve. When read together, we have two provisions of the Constitution which relate to this question. The first was intended merely to define the general qualifications of voters for elective officers or upon questions which may be submitted to the vote of the people which affect the public affairs of the state; the second, a provision by which it is made the duty of the legislature to protect the taxpayers of every city and village in the state and to restrict their power of taxation, assessment, borrowing money and contracting debts, so as to prevent any abuse thereby. One is general, relating to the whole state. The other is in effect local, relating only to the cities and villages of the state. One relates only to the general governmental affairs of the state. The other relates to the business or private affairs of the municipalities specified " (p. 289).

A similar question arose in *People ex rel. Furman* v. *Clute* (50 N. Y. 451). FOLGER, J., in his opinion said: " The legislature may not put upon any elector a personal restriction from voting for any officer who may be elective, or whom it may declare elective, save such restriction as is imposed by the Constitution, for from that it is especially prohibited. But it may, in the exercise of its judgment *for the public good, limit the number from whom the elector may select*, for thus to legislate is within the general and sovereign power of legislation, which it con-

stitutionally possesses" (p. 459). (See, also, Lincoln, Constitutional History of New York, vol. 1, pp. 640–652; Dougherty, Constitutional History of New York State, pp. 93–96; *Rogers . v. Common Council of Buffalo*, 123 N. Y. 173.)

Minority representation by voting has not been unknown in the history of elective franchise in the State of New York. Chapter 590 of the Laws of 1857, relating to the selection of Supervisors of New York county, established a board of twelve members, each elector voting for six. The six receiving the highest number of votes were to be declared elected. The statute then provided that the Mayor must appoint the six receiving the next highest number of votes as to the other members of the board. This system, slightly modified by chapter 321 of the Laws of 1858, continued in force until 1874. Limited voting was, in fact, applied to inspectors of election in cities and towns as early as 1842. An act of that year provided for three inspectors in each election district. Each voter was permitted to vote for two, and the two highest were to be declared elected. The third inspector was to be appointed by the officers presiding at the town meeting or charter election from the two candidates receiving the next highest number of votes. (Laws of 1842, ch. 130, tit. III, art. third, § 21.) This system persisted in towns and certain cities until 1881. (Laws of 1881, ch. 137.) By chapter 335 of the Laws of 1873 there was created for the city of New York a board of twenty-one Aldermen, six to be elected at large, of whom each elector might vote for four; and fifteen elected, three from each of five districts, each voter being limited to vote for two out of three from his district.

This system was amended by chapter 757 of the Laws of 1873, and continued as amended. It was further amended by chapter 515 of the Laws of 1874, which increased the number of Aldermen to twenty-two, one district being given four Aldermen instead of three, each

voter being limited to a vote for three out of the four, the other provisions remaining unchanged.

The system was again amended by chapter 400 of the Laws of 1878, section 1, which continued the number of Aldermen at twenty-two, but divided the district which had theretofore elected four Aldermen into two districts, one of which was to elect three Aldermen, each voter being limited to voting for two, and the remaining portion of the district being made a single member district.

In 1881 the Commissioners appointed to revise the charter of the city of New York carried this same system of limited voting for Aldermen into their draft of the Consolidation Act, and the same provision appeared in the Consolidation Act (Laws of 1882, ch. 410, § 29) and continued in force until abolished by chapter 292 of the Laws of 1887.

Thus limited or proportional voting was carried on in the city of New York, first for supervisors and then for Aldermen, for a continuous period of thirty years from 1857 to 1887.

The Board of Supervisors for the city of New York was abolished in 1874 and the Board of Aldermen established. (Laws of 1874, ch. 304.)

This system of voting for Aldermen in the city of New York was brought to the attention of this court in *People ex rel. Angerstein* v. *Kenney* (96 N. Y. 294). Judge EARL wrote the opinion. He stated: "Under that article [section 1 of article II of the State Constitution] it is insisted that the system of minority election, as embodied in the act of 1873, was unconstitutional, and that at every election every voter had the right to vote for every officer to be chosen from the city at large, or from the district in which he resided." (p. 300). Although the action was brought by the Attorney-General of the State for the purpose of settling this question, the point was not decided, as the terms of office for all the candidates interested had expired. Therefore, Judge EARL said: "The constitutional question which the plaintiffs sought

to raise by the commencement of this action is a very grave and interesting one, and should not be decided in any case unless it is properly presented, and necessarily involved. It need not be decided in this case " (p. 302). Besides, said the judge, and the court followed him, it did not appear that any voter objected and insisted upon voting for others than he did vote for. In other words, the question was presented and not decided, and that is all there is to the *Kenney* case.

The fact remains, nevertheless, that for thirty years the system of minority representation prevailed in the Board of Aldermen of the city of New York and was never declared unconstitutional. During these years the press and the bar included men of marked ability and energy, with a willingness and courage to attack any fundamental principle of municipal government which was wrong. We can hardly imagine that article II, section 1, of the Constitution forbade the election of aldermen of the city of New York under a minority representative system, and that the people for all these years slept upon their rights.

*Matter of Hopper* v. *Britt* (203 N. Y. 144), from which the briefs have copied so copiously, has no bearing upon this point we are now considering as it related to a limitation placed upon one voter which did not apply to another voter in the same district. Where all the voters had a right to vote for certain candidates the Legislature had made it difficult for those who wanted to vote for one candidate and easy for those who desired to vote for another. Chapter 43 of the charter, relating to the proportional voting, treats all electors alike, and does not prevent a man from voting for the candidate of his choice.

*People ex rel. Goring* v. *President of Vil. of Wappingers Falls* (144 N. Y. 616) likewise has no application, as, under section 1005, subdivisions 3 and 4, of chapter 43 of the present charter, a blank place is left upon the ballots, wherein any voter may write the name of any person he desires to vote for. He is not bound to vote simply for those who have been nominated.

To me it seems evident from what I have quoted that article II, section 1, does not prevent a system of minority representation or proportional voting such as is here presented. Reason likewise points out that if the law permits a borough to be divided into districts, and the people of the borough thus forced to vote for only one Councilman in each district, it is equally permissible to elect the same number from the entire borough, each voter selecting but one.

The main argument against the constitutionality of this chapter has been that the proportional voting system permits the voter to select but one of the Councilmen from his borough. This is emphasized in all the briefs and in all the arguments. For this reason I have taken up this question at the beginning.

The other objections which have been presented have to do with the manner of voting and of counting the ballots. In a word, the system is described as one in which nominations for Councilmen may be made on the petition of two thousand electors. These are listed, and the voter on election day may vote for any of them or a person of his own choice, but, instead of making his mark as is now the practice, he places figures before the name of his choice, beginning with one and running up to as many as he wants to vote for. The numerical order represents his preference. Anybody getting first preference to the amount of seventy-five thousand is considered elected, and the votes for that person thereafter are given to the second choice on that ballot. It may be well to give the whole matter more in detail:

Chapter 867 of the Laws of 1934, as amended by chapter 292 of the Laws of 1935, provides for a New York City Charter Revision Commission. Section 5 of that act provides for the submission to the people of the question whether the proposed charter shall be adopted. It further provides that no provision in said charter for the election of any elective officers by any system of pro-

portional representation shall become effective unless the definite question with respect to the adoption of such system for the election of such officers shall have been separately submitted and approved by the affirmative vote of a majority of the electors. If such question is so approved, then such system of proportional representation shall be and become effective.

At the general election of 1936 the proposed New York charter was submitted to the people and adopted by them. Chapter 43, providing for the election of Councilmen by the system of proportional representation, was submitted to the voters as a separate question, and was likewise adopted.

Section 22-a of the new charter provides: " The council shall consist of the president of the council and of other members termed councilmen." In section 22-b it is provided that Councilmen shall be elected one from each of the Senate districts lying wholly within the city, plus a specified number at large from each of the named boroughs. In section 1001, which is a part of chapter 43, provision is made that if chapter 43 is approved by the electors when the question is submitted to them, then subdivision " b " of section 22 shall have no effect. As stated above, the election of Councilmen by the system of proportional representation, as outlined in chapter 43, was approved by the electors, and thus by the terms of the charter section 22-b is of no effect and chapter 43 governs the election of Councilmen.

Chapter 43 of the new charter provides: Councilmen shall be elected by the system of proportional representation provided for in that chapter, from each borough in proportion to the number of valid votes cast for Councilmen in such borough as thereinafter provided. Elections shall be conducted by the election authorities prescribed by the election law and the provisions of that law so far as applicable shall govern the election except as provision is otherwise therein made. (§ 1002.)

Each borough shall be a single separate district for the election of Councilmen by proportional representation and shall elect one Councilman for each seventy-five thousand voters who have cast valid votes for Councilmen within it. A remainder of fifty thousand votes or more shall entitle a borough to one additional Councilman, and each borough shall be entitled to at least one Councilman. (§ 1003.) In the nomination of candidates no primaries are to be held, but nominations shall be by nominating petitions containing the signatures of at least two thousand electors who have registered as voters in such borough within eighteen months prior to the filing of the petition. An elector can sign only one such petition. The petitions may specify party, group or individual designations, but shall contain no emblem. Electors may sign petitions regardless of their party affiliations. (§ 1004.) Unless voting machines are provided, Councilmen are to be voted for on paper ballots separate and distinct from ballots used for any other office. In the first election district the names of the candidates shall appear in alphabetical order; in the next district they are to appear in the same order except that the first name appears last; and they are to rotate in that manner in each successive election district in the borough. The ballots can contain no emblem, and only one square for voting before each candidate's name. After each candidate's name shall be printed the party, group or individual designation which, according to the certificate of the authorized officers of such bodies, he is entitled to use. Blank spaces are provided for writing in names. There will be no indication on the ballot of the definite number of candidates to be voted for. Voters are instructed to place the number " 1 " in the square opposite their first choice, number " 2 " opposite their second choice, and so on. They may mark as many alternate choices in this manner as they please. (§ 1005.)

Prior to the election, the board of elections must designate a central counting place for each borough where all

the ballots of that borough are to be brought together and counted publicly. Two directors of the count are to be appointed, one from each of the two major political parties. A staff of assistants is to be appointed, such assistants to be selected by non-competitive civil service examination and so as to secure equal representation of the same two parties. As soon as the polls have closed in each district, the election officials shall seal the ballot boxes and send them to the central counting place where the number of votes cast shall be checked with the records. In preparation for the count, the ballot boxes shall be arranged in the order of election districts (§ 1006), so that the first election district of the first Assembly district is first; the first election district of the second Assembly district is next, and so on. The first election district whose ballots are to be sorted shall be determined by lot, and the rest follow in regular numerical order. At the beginning the ballots are sorted according to first choices marked on them. Where the ballot does not clearly show which candidate the voter prefers above all others, or where it contains some mark identifying the voter, it shall be invalid, but otherwise the ballots shall be counted according to the intent of the voter. (§ 1007.)

Section 1007, subdivision " c," reads as follows: " Single transferable vote for each voter. Each candidate shall be credited with one vote for every valid ballot that is sorted to him as first choice or otherwise credited to him as hereinafter provided, and no ballot shall ever be credited to more than one candidate at the same time." The remaining subdivisions of section 1007 direct the crediting of ballots and the method of counting. The quota of votes sufficient to elect a Councilman shall be seventy-five thousand. Whenever at any stage of the counting the number of ballots credited to a candidate equals that number, he shall be declared elected and no ballots in excess of that number shall be credited to him. However, if, after a candidate has been so elected, a ballot

appears which indicates him as the voter's first choice and shows no other choice for any unelected candidate, it shall be given to the candidate of first choice and the last ballot sorted to that candidate which does show a choice for an unelected candidate shall be taken from him and re-sorted to the next available choice, as if it were being sorted for the first time. If a candidate has been found to be elected while the ballots are being sorted according to first choice, each subsequent ballot which shows him as first choice shall be credited to the second choice marked on it, or, if the latter has been also elected, to the next choice marked on it for a candidate not elected. When all the ballots have been thus sorted and credited to the first available choices marked on them, the total number of valid ballots shall be determined by adding the totals credited to all the candidates. The number of Councilmen to be elected from the borough shall be the number of times this total contains seventy-five thousand, disregarding fractions, except that a remainder of fifty thousand or more shall entitle the borough to one additional Councilman. Each borough is in any event entitled to at least one.

When this process is completed, each candidate credited with fewer than two thousand ballots is declared defeated. All the ballots credited to these defeated candidates shall be transferred, each to the candidate indicated on it as next choice among the continuing candidates. "A 'continuing candidate' is a candidate not yet elected or defeated." (§ 1007, subd. i.) A ballot taken for transfer which does not clearly indicate any candidate as next choice must be set aside as exhausted. After the ballots have been thus transferred, the one candidate who is lowest on the poll shall be declared defeated and his ballots shall be transferred in the same way. Then the next lowest candidate is declared defeated and his ballots similarly transferred. This goes on until the election is completed. In deciding a tie, a candidate shall be treated

as having more votes than another if he was credited with more votes at the end of the last preceding transfer or sorting of ballots at which the numbers of their votes were different. Any tie not thus decided shall be decided by lot. When the number of candidates declared elected by virtue of having received the quota of seventy-five thousand votes equals the total number of Councilmen to be elected in that borough, the other candidates are then declared defeated, and the election is at an end. If, however, at any time all ballots of defeated candidates have been transferred and it is impossible to defeat another candidate without reducing the number of continuing candidates below the number still to be elected, all the continuing candidates shall be declared elected. (§ 1007, subds. i–n.)

For the purpose of facilitating a recount, it is provided (§ 1007, subd. o) that every ballot that is transferred from one candidate to another shall be so stamped or marked that its entire course from candidate to candidate can be conveniently traced. If in correcting an error or recounting ballots for any other purpose any ballots are re-sorted or re-transferred, every ballot shall be made to take the same course that it took in the original count unless the correction of an error requires its taking a different course. Provision is made for voting machines (§ 1008) and for the attendance of watchers, challengers, representatives and observers. (§ 1009.) Before the first of January following the election, the Board of Elections must cause the ballots to be examined and shall make public the number of first choice votes cast for each candidate and such other information as may be required, or which they may deem of interest. (§ 1010.)

The principal objections to this method have been to the whole system. It is insisted that a voter must be given the right to have his vote counted at all times and under all conditions for the man he voted for as his first and only choice, irrespective of the fact that the man may have been elected before his ballot was reached; and,

secondly, that it is illegal to have the number of Councilmen dependent upon the number of votes cast in the entire borough. In other words, *actual* representation according to. numbers is illegal, although *unequal* representation according to unequal districts is legal. I cannot follow this reasoning.

We must always be careful in approaching a constitutional question dealing with principles of government, not to be influenced by old and familiar habits, or permit custom to warp our judgment. We must not shudder every time a change is proposed. Many times those who are strongest for efficiency in business are loudest in their protest against efficiency in government. At least this Hare System of Proportional Voting is an attempt to make representative government a reality. It is common knowledge that many of our districts are so divided that equality of representation does not exist. This proposed system may be unworkable; it may be so cumbersome or so intricate as to be impracticable; the results desired may not be obtained; the remedy may be worse than the disease, but what have all these to do with the Constitution? If the people of the city of New York want to try the system, make the experiment, and have voted to do so, we as a court should be very slow in determining that the act is unconstitutional, until we can put our finger upon the very provisions of the Constitution which prohibit it. It has been our repeated admonition that legislation should not be declared unconstitutional unless it clearly appears to be so; all doubts should be resolved in favor of the constitutionality of an act. This court has repeatedly stated that the wisdom of legislation is not for us to determine.

The Hare System of Proportional Voting has been used in Cincinnati, Toledo, Wheeling, Hamilton (Ohio), Boulder (Col.), Winnipeg, Calgary, for the Provincial Legislatures of Manitoba and Alberta; in all elections in the Irish Free State; in the election of nine university members of the

British House of Commons; in Australia, New Zealand, South Africa and Denmark. This statement I take from the briefs, as it has not been questioned. We cannot say, therefore, that it is a mere dream or speculation. It has been used and found to work. Can the people of the city of New York under our Constitution try it? That is the sole question.

Other courts have been divided upon this question. *Wattles ex rel. Johnson* v. *Upjohn* (211 Mich. 514) and *People* v. *Elkus* (59 Cal. App. 396) have held this system of voting unconstitutional under their State Constitution. (See, also, *Brown* v. *Smallwood*, 130 Minn. 492.) On the other hand, *Reutener* v. *City of Cleveland* (107 Ohio St. 117) declared it constitutional. (See, also, *Commonwealth ex rel. McCormick* v. *Reeder*, 171 Penn. St. 505.)

The Corporation Counsel has also presented the point that the adoption of the Home Rule Amendment to the Constitution modified article II, section 1, or at least permitted the city by its charter, adopted under the Home Rule provision, to place restrictions upon voting not permitted by article II, section 1. We do not follow him in this argument. However, it is unnecessary for us at this time to pass upon the question as we feel, for the reasons herein stated, that chapter 43 of the new charter of the city of New York, relating to proportional voting, is not proscribed by article II, section 1.

The judgment entered at Special Term held in and for the county of Kings should be reversed, and the complaint dismissed, without costs. The order of the Special Term held in and for the county of New York should be affirmed, without costs.

LEHMAN, J. (concurring). I agree with much that is said in the dissenting opinion, and I am constrained to question much that is said in the prevailing opinion, though I concur in its result. The method of voting as provided in chapter 43 of the new charter of the city of

New York is intended to permit the election of officers of government by a minority of the voters, and thus to give to minority groups a share in government which must be denied to them if we adhere to the principle that all officers of government must be elected by a plurality of the voters of the voting district, or appointed by an officer or body so elected. Its purpose is to limit the dominance of majorities and that purpose cannot be attained if each voter is permitted to register his choice of candidates for every elective official position to be filled by election in the voting district.

Attempted analogy between such a system and a system of electing officers by majority vote in limited districts seems to me entirely specious. Distinction here is based on fundamental principle. The question still remains whether the principle of election by plurality of all the votes cast in the voting district is embodied in the Constitution. Undoubtedly it is, at least, doubtful whether article II, section 1, of the Constitution does not require adherence to that principle. That is hardly disputed even by those who drafted the provisions of the charter now challenged. In other jurisdictions the courts have so construed similar provisions. Even in the case of *Reutener* v. *City of Cleveland* (107 Ohio St. 117), where proportional representation was sustained, the court pointed out that the language of the Ohio Constitution is different. There are, at least, indications in the opinion that, except for such difference in language, the court might have felt itself constrained to reach other result.

I find it difficult indeed to reconcile the system of proportional representation with the constitutional provision that each voter " shall be entitled to vote in the town or ward where he actually resides * * * for all officers that now are or hereafter may be elective by the people." It is, of course, true that this constitutional provision was inserted in the Constitution primarily in order to prohibit discrimination between voters, and that

nobody then thought of "proportional representation" as a practical political expedient. None the less, a literal or even a reasonable construction of the language of the Constitution would seem to exclude a system by which the votes of each voter may be counted for only one candidate though more than one officer is to be chosen at the election. Nothing said or decided in any case in this court points a way to other construction.

Nevertheless, in view of the fact that the constitutional provision was drafted to meet a different problem, it may be possible to construe the provision differently. Though I share Judge RIPPEY's misgivings about the possible result of the innovation, such misgivings may not blind me to the fact that the innovation does not violate the spirit of any of the great basic principles which are intended to be protected by the Constitution and that it is *possible* to construe the letter of the Constitution in manner which will confine its letter to the purposes which it is clear that the letter was intended to cover. There may then be room for reasonable doubt as to the scope of the constitutional provision and reasonable basis for the conclusion that those who challenge the validity of the new system of voting have not shown unavoidable conflict between such system and the provisions of the Constitution. For that reason I agree with the majority of the court that we may not declare invalid the charter provisions here challenged.

RIPPEY, J. (dissenting). At the general election held on November 3, 1936, a new charter was adopted for the city of New York previously formulated and recommended for adoption by a Commission appointed and acting pursuant to the authority granted by the Legislature of the State of New York under chapter 867 of the Laws of 1934, as amended by chapter 292 of the Laws of 1935.

Chapter 2 of the charter provides that the legislative power of the city shall be vested in a Council to be elected at the general election in 1937 and each two years

thereafter. By the provisions of section 22 (subdivisions [a] and [b]) of that chapter it is provided that the Council shall consist of the President of the Council and of thirty-two other members who are termed Councilmen. Section 22 (b) reads as follows: " b. Councilmen shall be elected one from each of the senate districts as now or hereafter constituted lying wholly within the city; and, until there shall be a readjustment pursuant to the provisions of the constitution of the senate districts as they existed on the first day of January, nineteen hundred thirty-six, three additional councilmen shall be elected at large from the Borough of Brooklyn, three at large from the Borough of the Bronx, three at large from the Borough of Queens and one councilman shall be elected at large from the Borough of Richmond; provided that at all times there shall be at least one councilman elected from each borough." There are nine Senate districts within the borough of Manhattan, eight within the borough of Brooklyn, three within the borough of the Bronx, and two within the borough of Queens. Thus this section creates by legislative act thirty-three constitutional, elective city offices and thirty-three elective officers to be voted for to fill such offices with definite geographically limited units of representation for election purposes along well-defined constitutional lines, and its validity is not here in dispute. The Senate district is established in advance of election by legislative act as the unit of representation for a fixed number of councilmanic offices, as to time and manner similarly created, to be filled by a fixed number of officers similarly provided for in advance, except as to the fixed number of Councilmen at large, allocated to the different boroughs until there shall be a constitutional reapportionment, where the borough is the unit of representation. Thus each qualified elector within the city of New York may vote for *all* the candidates for members of the Council who are to be elected within his election district. Each qualified elector in the

boroughs of Brooklyn, the Bronx and Queens may vote for the President of the Council and four Councilmen, and in the boroughs of Manhattan and Richmond for the President of the Council and one Councilman. This plan for election of the legislative body of a city has been found by this court to be constitutionally sound. (*Bareham* v. *City of Rochester*, 246 N. Y. 140.) Councilmen of the city of New York are constitutional officers with State functions (*People ex rel. Deitz* v. *Hogan*, 214 N. Y. 216; *Needleman* v. *Voorhis*, 254 N. Y. 339), and they must be chosen by the methods fixed by the Constitution and by statutes applicable to all cities alike. Thus methods by which nominations of candidates to be voted for at the general election to fill the offices are duly provided for in harmony with the general election laws of the State. Among other things, at least three months before the general election to be held on November 2, 1937, the City Clerk of the city of New York is required to certify to the Board of Elections each city officer to be voted for at such election.

Chapter 43 of the charter provides for the election of Councilmen by a complicated and cumbersome system, there set up in detail and known as proportional representation. This chapter was proposed with the rest of the charter provisions by the Charter Commission as an alternative for section 22 (b), but no recommendation was made for its adoption. Section 1001 of the chapter provided that it should take effect only in the event that a majority of the electors of the city voting thereon should approve of it when submitted to them for approval, and that, if then approved, subdivision (b) of section 22 should be of no effect. Under the authority of chapter 867, section 5, of the Laws of 1934, chapter 43 was separately submitted at the general election in 1936. The scheme was adopted with about one-half of the qualified electors voting on the question. 2,823,191 votes were cast at the general election for President of the Board

of Aldermen; 923,186 votes for adoption of chapter 43; 555,217 votes against its adoption.

An action was brought in the Supreme Court of Kings county for a judgment declaring that chapter 43 is unconstitutional and for other relief, and a decree was granted to that effect. A mandamus proceeding was instituted in New York county to compel the City Clerk of the city of New York to certify pursuant to the provisions of section 69 of the Election Law (Cons. Laws, ch. 17) the officers to be elected under section 22 (b) of the charter, to compel the Board of Elections to take appropriate steps as required by the Election Law for the primary election of candidates to be voted for at the general election and to restrain action under the provisions of chapter 43 of the charter. In this proceeding petitioners were unsuccessful. Appeals directly to this court in both cases under the provisions of section 588, subdivision 3, of the Civil Practice Act bring to us for determination the sole question of the constitutionality of chapter 43.

At the outset, it is asserted that this court settled the question of its constitutionality in *Matter of Mooney* v. *Cohen* (272 N. Y. 33; 272 N. Y. 597). That was a mandamus proceeding to restrain the submission of the question to the electors of whether or not the proposed charter should be adopted, and the sole matter considered or passed upon was whether the mere matter of its submission by referendum was constitutional. The question here presented might have been considered (*Matter of McCabe* v. *Voorhis*, 243 N. Y. 401; *Matter of Tierney* v. *Cohen*, 268 N. Y. 464; *Matter of Osborn* v. *Cohen*, 272 N. Y. 55), but it was not. Jurisdiction in the proceedings now before the court is discretionary (*Bareham* v. *City of Rochester*, 246 N. Y. 140, 143), and we might properly decline to pass on the questions presented until an actual controversy between proper parties litigant concerning some action later taken or refused were presented.

Prudence and the public interest, however, impel us to take jurisdiction. Taxpayers as well as electors are interested parties; it is represented that it will cost the taxpayers of the city of New York several million dollars to prepare for and conduct an election under the chapter in suit. If an election should be held under its provisions and the scheme later be declared unconstitutional, great confusion if not much more serious consequences might result. But I expressly limit this opinion to the sole question as to whether the plan upon its face as outlined in chapter 43 is constitutional.

Where the claim is made that a legislative act is unconstitutional, the courts uniformly entertain such contentions with skepticism and extreme caution, and should never invalidate it unless its unconstitutionality is so clear as to leave no room for rational doubt. (*Com.* v. *Smith*, 4 Binn. [Pa.] 117, 123; *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. [U. S.] 518, 625; *Fletcher* v. *Peck*, 6 Cranch [U. S.], 87, 128; *Ogden* v. *Saunders*, 12 Wheat. [U. S.] 213, 270; *Sinking-Fund Cases*, 99 U. S. 700, 718.) This court has said that there must be some specific provision of the Constitution with which it clearly conflicts. (*Cleveland* v. *City of Watertown*, 222 N. Y. 159, 164.) But when that conflict is found, if no way may be found to avoid the issue, it is the duty of the courts to hold the act violative of the fundamental law.

The complicated and confusing detail of the scheme set up in chapter 43 cannot be fully covered within the proper confines of an opinion. By the provisions of section 1003 of the chapter each borough constitutes a single district for the election of Councilmen which " shall elect one councilman for every seventy-five thousand voters who cast valid votes for councilmen within it. A remainder of fifty thousand such voters or more shall entitle a borough to one additional councilman, and each borough shall be entitled to at least one councilman." Section 1004 provides for nominations. Within one hun-

dred days before election a candidate may be nominated by petition containing the signatures of not less than 2,000 electors who have registered as voters within eighteen months previous to filing of the petition. Thus the maximum number of candidates that may be nominated is the total number of such qualified voters in the borough divided by 2,000. Section 1005 provides for ballots and voting, and the arrangement and shifting of names on the ballots in the several election districts in such a way as to present great difficulty for a voter to find the candidate of his choice. It is provided that "There shall be no indication on the ballot of a definite number of candidates to be voted for " (subd. 4). The voter may indicate on the ballot his choice of candidates in numerical order by placing numbers in the squares opposite their names. Sections 1006 and 1007 provide for the methods by which the validity of the ballots may be determined and for the counting of the votes. A central counting place is to be provided in each borough. Thus the count cannot be made at the polling place as provided in the Election Law. At the close of the polls, ballots from all polling places within the borough must be collected at the central counting place and arranged in the order of similarly numbered election districts (there are 3,799 election districts in the city of New York), then sorted according to the first choices marked on them after the first election district for sorting has been drawn by lot. By designated processes for the determination of the validity of ballots and for shifting and shuffling them between choices and the application of the mathematical processes of addition, subtraction, multiplication and division, the personnel making the count determines how many councilmanic offices have been created by the voters and who they have selected to fill those offices. No matter how many offices of Councilmen have thus been created, no elector is permitted to have his vote counted for more than one candidate and that one candidate is the one on whom the counting

personnel determines his choice shall fall. The open and avowed purpose of the scheme is to secure elections by minorities, and to provide for and encourage group voting, the destruction of party government and party responsibility and of the principle of majority rule which basically underlies the American system of representative government. The practical result of its operation is to delegate the constitutional and legislative function of the creation of office to the electorate and the disenfranchisement of duly qualified voters by exclusion of their right to vote and to have these votes counted for candidates of their choice for all offices to be filled or voted on in these several units of representation. The scheme set up in chapter 43 of the charter for the creation of councilmanic offices and election of Councilmen is unconstitutional beyond any rational doubt.

Article I, section 1, of the State Constitution reads as follows: " No member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers."

Article II, section 1, provides that " Every citizen of the age of twenty-one years " within the prescribed residential and literary qualifications, " shall be entitled to vote at such election in the election district of which he or she shall at the time be a resident, and not elsewhere, *for all officers that now are or hereafter may be elective by the people.*" (Italics ours.)

Can there be any doubt concerning the meaning of those words? Does the language mean what is expressly said or does it mean something else that someone would like to have it mean? Do the expressions mean that the elector shall have a right to vote for *some* officers only? The answer is too simple and obvious to be open to discussion. Where the words " all officers " are there used they mean " *all* officers " and not " *some* officers." Words and phrases in the fundamental law may not be

ignored or their ordinary meaning distorted. (*Matter of Smith* v. *Board of Supervisors,* 148 N. Y. 187, 193.)

The expression " for all officers " first appears in the Constitution of this State in the Constitution of 1821. The struggle to frame the suffrage provision was not exclusively centered, as has been asserted, in the matter of property qualifications. It was likewise centered on extending and preserving the right of each duly qualified citizen to vote for *all* elective officers offered in his election district instead of being limited to vote for *some* or a limited few. During the debates in the Constitutional Convention of 1821 preceding the adoption of article II, section 1, at least ten resolutions or motions brought up that point. There finally emerged the expression now found in article II, section 1, as intended to be comprehensive enough to confer the right to suffrage upon all duly qualified electors to vote for all officers to be elected to all offices for which it was permissible for him to vote *within his election district.*

There is no provision of law in this State and cannot be any such which bars a duly qualified voter from casting his ballot for his candidate for every office for which voting is permissible within his election district. And yet this law says that he can vote for one Councilman and for one only although there may be, under the terms of the act, if he resides in Brooklyn, at least as many as twelve Councilmen to be elected, or if he resides in Manhattan at least as many as nine and all such offices available for his vote within the election district within which he resides. Under chapter 43, no matter how many offices of Councilmen may be created by the voters in any particular unit of representation, the ballot of the elector can be counted for only one candidate for one office. No matter how many choices he may indicate on his ballot, his vote will count, if it counts at all, for only one choice. No matter how sincere may be his desire to vote for a particular candidate for a particular

office, his wish may be frustrated by mathematical processes and manipulation. And finally by fiat of law he may be precluded from voting for the office at all.

Where such constitutional guaranties exist, so far as diligent and eminent counsel have been able to show, no court has ever declared that a duly qualified voter may be debarred from voting for a candidate of his choice for every office available for his suffrage. On the contrary, decisions in this and other States uniformly declare that such expressions in the fundamental law mean what they say and include that which may be implied to make the exercise of the right of suffrage effective; they give to the voter the right to vote and to have his vote counted at any election for *all* officers that may be elective within his unit of representation for every office to be filled and any system of voting like the one here devised which impairs such right is unconstitutional. (*Matter of Gage*, 141 N. Y. 112; *People ex rel. Goring* v. *President of Vil. of Wappingers Falls*, 144 N. Y. 616; *Matter of Callahan*, 200 N. Y. 59; *Matter of Hopper* v. *Britt*, 203 N. Y. 144; *Brown* v. *Smallwood*, 130 Minn. 492; *Maynard* v. *Board of Canvassers*, 84 Mich. 228; *Wattlcs ex rel. Johnson* v. *Upjohn*, 211 Mich. 514; *McArdle* v. *Mayor*, 66 N. J. L. 590; *People* v. *Elkus*, 59 Cal. App. 396; *Opinion to the House of Representatives*, 21 R. I. 579; *Bowden* v. *Bedell*, 68 N. J. L. 451; *State* v. *Constantine*, 42 Ohio St. 437.) In the *Goring Case (supra)* Judge GRAY said: " The Constitution confers upon every citizen, meeting the requirements specified therein, the right to vote at elections for all offices that are elective by the people and there is no power in the legislature to take away the right so conferred. The legislature may prescribe regulations for ascertaining the citizens who shall be entitled to exercise the right of suffrage, for that power is given to it by the Constitution. In prescribing regulations for that purpose, or in respect to voting by ballot, it does so subject to and, presumably,

in furtherance of the constitutional right and its enactments are to be construed in the broadest spirit of securing to all citizens, possessing the necessary qualifications, the right freely to cast their ballots for offices to be filled by election and the right to have those ballots, when cast in compliance with the law, received and fairly counted. Legislation which fails in such respects and prevents the full exercise of the right as secured by the Constitution is invalid " (p. 620).

Particularly apt are the words of the Michigan Supreme Court in the *Wattles Case (supra)*, where it was called upon to pass on the constitutionality of a provision of the charter of the city of Kalamazoo requiring the election of seven city commissioners in the city at large by a system of proportional representation.

" Each elector," said the court, " had the right to vote for seven candidates, by a vote not only ' of equal effect with, and no more than, the vote of every other elector for every officer to be elected,' but of equal potential value as to each of the seven candidates he voted for. As construed in the *Maynard Case*, the Constitution gave him the right to express his choice by a ballot vote for each of the seven commissioners to be elected; and having done so, he ' exhausted his privilege.' The Hare system limits his power to express his preference ' in this manner ' to but one candidate of the seven, only permitting him to express a second choice for one other, and so on by numerically dwindling and weakening choices until the elector has expressed thus ' as many choices as you (he) please.' As said in the *Maynard Case*, ' it is not in the power of the legislature (nor a city adopting a charter under the home rule act) to give his preference or choice, without conflicting with these provisions of the Constitution, more than a single expression of opinion or choice; ' and he has the right to express that single choice as to each of the officers to be elected in his district. While each voter can under the Hare system vote for

all candidates to express sequential choices as provided, it is evident that his vote is primarily and positively effective for only one candidate " (p. 534).

Furthermore, by the express provisions of the local law, there is an unconstitutional delegation to the voters on election day of the *power to create* all offices of Councilmen except one for each borough. Chapter 43 neither creates the offices of Councilmen nor fixes their number. In some cases, public offices are expressly created by provisions of the Constitution (Arts. IV and V). Where not so created, they may be created by the Legislature or by the authority it may select (Art. X, § 2; art. XII, § 3). But city offices may be created under the Home Rule Amendment *only by a local law* (Art. XII, § 3). Power to create the office of Councilman and to fix the number of such offices is a legislative power and lies nowhere else and cannot be delegated to any administrative agency or to the people themselves. (*Barto* v. *Himrod,* 8 N. Y. 483; *People* v. *Conover,* 17 N. Y. 64, 67; *Eckerson* v. *City of New York,* 176 N. Y. 609; *Meyers* v. *Mayor,* 69 Hun, 291; *People ex rel. Percival* v. *Cram,* 164 N. Y. 166; *People ex rel. Unger* v. *Kennedy,* 207 N. Y. 533, 544; *Matter of McCabe* v. *Voorhis,* 243 N. Y. 401; *Matter of LaRocca* v. *Flynn,* 257 N. Y. 5, 16; *Bareham* v. *City of Rochester,* 246 N. Y. 140; *Matter of Gage,* 141 N. Y. 112; *Matter of Burke* v. *Cohen,* 265 N. Y. 210; *People* v. *Ryan,* 267 N. Y. 133; *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 430.) In the *Unger Case* (*supra*) it is said: " The proposition that by our Constitution general powers of legislation are conferred exclusively upon the legislature and that this body may not escape its duties and responsibilities by delegating such legislative powers to the people at large, must be regarded as so thoroughly established that it needs no discussion."

Yet chapter 43 of the New York Charter makes the creation of office of Councilman not a legislative act but the act of the people at the very time that they are

voting for officers to fill councilmanic offices created only by virtue of the number of valid ballots that may be cast. Not only do the number of offices to be created and the creation of the specific office depend upon the vote, but the number may be limited by the shifting and shuffling of votes and by the determination of the counting personnel as to their validity.

The fact that legislative and charter commissions as well as constitutional conventions for more than fifty years and our courts have held that any scheme for proportional representation or minority representation in local government could not be adopted without an amendment to article II, section 1, of the Constitution should be given the greatest weight. (*People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367, 376; *Story* v. *Craig*, 231 N. Y. 33; *Matter of LaRocca* v. *Flynn*, *supra.*) In addition to the authorities above cited, Judge EARL, in 1884 in *People ex rel. Angerstein* v. *Kenney* (96 N. Y. 294) pointed out (at p. 303) the gravity of the question of the constitutionality of any statute permitting limited voting. In 1877 a Legislative Commission appointed to devise a plan for city government (Assembly Document No. 68 [1877], p. 47) and a New York City Charter Commission in 1922 each reported that such a plan was constitutionally unsound. The Constitutional Convention of 1894 discarded a proposal for proportional election of members of city legislative bodies by minority representation. By common consent in this State over a period of more than half a century, a scheme of that kind has been considered unconstitutional. What strange thing has suddenly occurred to bring it within the limits of our constitutional provisions? It is asserted that article XII, section 3, of the Constitution, in effect since January 1, 1924, and the City Home Rule Law (Cons. Laws, ch. 76) authorize the enactment of chapter 43. The contrary clearly appears. By express terms no city has power to adopt a local law inconsistent with the Constitution and laws of the State.

It is asserted that the proposed method of voting has been approved and adopted in this State and held valid, and cited as proof for that statement is the fact that Boards of Supervisors or Aldermen are elected by districts. Thereby, all electors in the county or of the city are not permitted to vote for all Supervisors to be elected in the county or all Aldermen to be elected in the city. Nevertheless there the elector within the town or ward votes for *all* candidates that may be on the ballot *in the election district in which he votes*. For example, each elector living in any election district in a ward in a selected city may vote at the general election to be held in November, 1937, for candidates for Associate Judge of the Court of Appeals, for justice of the Supreme Court, for Member of Assembly, for Sheriff, for District Attorney, for Surrogate, for Supervisor, for five City Councilmen at Large and for Constable. His governmental unit for election of Supervisor for the county is the ward. At the same time, be votes for candidates for State, county and city office because they are *all* candidates to be voted for *in his election district* as required by article II, section 1, of the Constitution. But what would be said if he should be denied the right to vote within that election district for four of the five City Councilmen, or for Sheriff, or Member of Assembly? Would a scheme so provided be declared constitutional? The answer is obvious. No one has ever had the temerity to even suggest it.

There is no doubt that, if Brooklyn were entitled to twelve members of the Council, the borough could be divided up into twelve districts and one Councilman elected from each district. A division by Senate districts is set up in section 22 (b). Such a division was declared constitutional in *Bareham* v. *City of Rochester* (*supra*). So also can a county having a board of forty-three Supervisors be divided into forty-three towns and/or wards and one Supervisor elected from each unit. But that is no ground for holding that chapter 43 is constitutional.

In the cases cited only *one* candidate for Councilman or Supervisor, as the case might be, is offered to the elector *in the election district in which he votes.* This is strictly within the letter of article II, section 1, of the Constitution and is quite different from placing the names of twelve Councilmen or forty-three Supervisors on the ballot *in the election district in which the elector casts his vote* and then prohibiting him from voting for more than one. It must also be remembered that whatever limited voting existed in New York city was constantly under attack and was finally discarded in 1887. The opinion of Judge EARL in *People ex rel. Angerstein* v. *Kenney* (*supra*) was written in 1884 and the question of the constitutionality of limited voting was held to be academic and was not passed upon, as the possible term of office of the relators had long since expired. Judge EARL said, however, " The constitutional question which the plaintiffs sought to raise by the commencement of this action is a very grave and interesting one, and should not be decided in any case unless it is properly presented, and necessarily involved." There was no evidence in that case, as stated by Judge EARL, that any voter was denied the right to vote for all candidates on the ballot in the election district where he voted.

Ours is a constitutional democracy — *a government of law* in which majorities rule. When the mandate of the law is plain, it is the duty of the court to follow. Courts must decide cases upon the law as written — not upon what *some* may think it ought to be or *wish it might* be to conform to fancy or theory. The courts may not usurp the legislative function or permit its unlawful delegation or override the plain and unambiguous mandate of the Constitution. The Constitution and the law permit of no such experiment as is attempted here.

The judgment appealed from in the Johnson case should be affirmed, with costs. The order appealed from in the Bowe case should be reversed, with costs, and the matter

remitted to the Special Term with directions to enter an order for the relief prayed for.

HUBBS, LOUGHRAN and FINCH, JJ., concur with CRANE, Ch. J.; LEHMAN, J., concurs in result in separate opinion; O'BRIEN, J.; concurs in result on the ground that chapter 43 of the charter providing for proportional representation is not so clearly in conflict with article II, section 1, of the Constitution as to require a declaration of invalidity; RIPPEY, J., dissents in opinion.

Judgment in Kings county case reversed and order in case of county of New York affirmed.