Fuchsbbrg, J.
(dissenting). I would have thought that a cornerstone of democracy is universal suffrage. Antithetical to this belief is a pecuniary or propertied qualification for voting, for it seems obvious that one’s influence in government should bear no relation to such a consideration.
It was in deference to this credo that this court some 10 years ago, in Matter of Wright v Town Bd. of Town of Carlton (33 NY2d 977, affg 41 AD2d 290), a case foursquare with the one before us now, declared a section of the Town Law which, for present purposes, cannot be differentiated from the one whose constitutionality we now weigh, violative of the one person-one vote principle. We then subscribed to the declaration that “insofar as it limits the franchise at the referendum to the ‘owners of taxable real property situate in the proposed district’ is unconstitutional” (41 AD2d, at p 294).
So saying, we but reiterated the policy pictured 15 years earlier when, in unmistakable terms, we held that, “the ownership of land, however, as a prerequisite, a condition precedent, to holding elective town office constitutes an ‘invidious discrimination’ against nonlandowners, a sort of economic gerrymandering which runs afoul of the equal protection and due process clauses of both Federal and State Constitutions * * * ‘Wealth, like race, creed, or color, is not germane to one’s ability to participate intelligently in the electoral process. Lines drawn on the basis of wealth or property, like those of race * * *, are traditionally disfavored’ ” (Landes v Town of North Hempstead, 20 NY2d 417, 420).
Yet today, a time when antidiscrimination legislation heightens concern for equality as never before, the court reverses its position. This it rationalizes, impermissibly I suggest, on the theory that two decisions of the United States Supreme Court, Salyer Land Co. v Tulare Water *316 Dist. (410 US 719) and Ball u James (451 US 355), found no Federal constitutional impediment to such legislation. But ignored is the fact that, as for instance in Ball, in both cases the “water districts”, when stripped of pretense, consisted of select groups which had formed private enterprises which were allowed “to become nominal public entities in order to obtain inexpensive bond financing” while they “remain[ed] essentially business enterprises, created by and chiefly benefiting a specific group of landowners” (Ball v James, at p 368 [emphasis added]).
In contrast, in Matter of Wright, as in today’s case, all registered voters, property owners and nonproperty owners alike, shared the same vital concern for the “availability of good drinking water, sufficient water to run their homes and businesses and to protect their property from fire. * * * [The payment of] real property taxes does not necessarily effect a reduction in the interest of those who do not own property because they pay increased taxes through increases in rent and the prices of goods and services * * * Thus, * * * voters who do not own real property are equally, and not less, interested in the outcome of the referendum as those authorized to vote by the property ownership qualification” (Matter of Wright v Town Bd. of Town of Carlton, supra, at p 293). Not surprisingly, then, Wright, after expressly considering the Salyer case (Ball not yet having been decided), rejected it as “not controlling”.
Now, however, the majority in today’s decision suddenly decides 10 years later “that the exception recognized in Salyer is broader than it was perceived to be when the Wright case was decided”. But, even if such a metamorphosis of Salyer were possible, there would be no need to blindly march to the Supreme Court’s drumbeat. For, as a sovereign State, New York has a Constitution of its own and section 1 of article II thereof expressly provides that “[E]very citizen shall be entitled to vote at every election * * * upon all questions submitted to the vote of the people” with the only limitation that the citizen be 21 years of age and have been a resident for at least three months next preceding the election. And this guarantee of the right to vote is available to New York citizens, all the *317 more so when the Federal Constitution is read in a less protective vein. Nor has New York hesitated to avail itself of this fundamental principle of federalism (e.g., Bellanca v State Liq. Auth., 54 NY2d 228; People v Elwell, 50 NY2d 231; Cooper v Morin, 49 NY2d 69, cert den sub nom. Lombard v Cooper, 446 US 984; Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159-161; People v Isaacson, 44 NY2d 511; People v Hobson, 39 NY2d 479). No less was to be expected, for the United States Constitution, from its beginning, inevitably was bound to reflect a broad consensus of the political and social conditions and aspirations of a union of many States, among which at least some were sure to adhere to higher than average standards. (See, generally, Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489.)
Nevertheless, in apparent anticipation of this dissertation, the majority, correctly noting that the verbiage employed by the State Constitution’s equal protection clause (NY Const, art I, § 11) is comparable to that found in the United States Constitution (14th Arndt), contends, at least by inference, that the one Constitution, therefore, grants no greater voting rights than does the other. The simple answer, though, is that, even where the language of the two Constitutions is precisely the same, there need be no uniformity of interpretation (see People v Elwell, 50 NY2d 231, supra; Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159-161, supra; People v Isaacson, 44 NY2d 511, 519-520, supra; Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd., 41 NY2d 84; see Mosk, State Courts in American Law: The Third Century [Schwartz ed], at pp 216-220).
Resort to the State Constitution, if here necessary, is obviously of especial urgency in an age when the growth of government has absorbed many functions which at one time were the province of the private sector. Moreover, many such activities are now carried out as a matter of governmental convenience, in agency form, as, for example, via the ever present school district, fire district, sanitary district, water district, etc. Were it permissible, therefore, to deprive citizens of their right to vote in elections in any of these “districts” on the theory that no one of them *318 performed a generalized governmental function, it would not be too long before, segment by segment, the right to vote would well-nigh disappear entirely. So, our courts, one by one, have struck down statutory attempts at the perpetuation of voting property qualifications (e.g., Kramer v Union School Dist., 395 US 621; Matter of Light v MacKenzie, 78 Misc 2d 315 [fire district]; Matter of Romano v Redman, 60 Misc 2d 859 [sanitary district]; Lippe v Jones, 59 Misc 2d 843 [improvement district]). Concordantly, in 1976, the Law Revision Commission warned that any statute which might still carry a property voting qualification would be “out of step with current constitutional thinking” (McKinney’s Session Laws of NY, 1976, pp 2177, 2178).[1]
Finally, to keep the depth of our commitment to freedom of the ballot in the broad perspective in which such a “fundamental matter” belongs (Reynolds v Sims, 377 US 533, 561-562 [Warren, Ch. J.]), I note the unanimity of the sentiments of political and legal philosophies as disparate in time and place as Jeremy Bentham’s eighteenth century observation that, “The right to elect * * * is the highest law of sovereignty”[2] and William 0. Douglas’ opinion that “all * * * are to have an equal vote — whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be * * *. This is required by the Equal Protection Clause”.[3]
From all this, it follows that subdivision 7 of section 206 of the Town Law of New York should be declared unconstitutional and the special election declared null and void.

. Hardly supportive of a contrary position are the three cases cited by the majority. One of these, Spitzer u Village of Fulton (172 NY 285), a waterworks case in which no equal protection challenge was made, antedates Wright by just 70 years. Neither of the other two, Johnson v City of New York (274 NY 411 [proportional representation]) and Matter of Blaikie v Power (13 NY2d 134 [councilman-at-large]), involved property qualification.

. (Bentham, Introduction to a Project for a Constitutional Code, reprinted in Engelmann, Political Philosophy, p 370.)

. (Gray v Sanders, 372 US 368, 379.)