Fossella v Adams (2025 NY Slip Op 01668)

Fossella v Adams

2025 NY Slip Op 01668

Decided on March 20, 2025

Court of Appeals

Wilson, Ch. J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on March 20, 2025

No. 15 

[*1]Vito J. Fossella, et al., Respondents,
v
Eric Adams, & c. et al., Defendants, City Council of the City of New York, Appellant, Hina Naveed, et al., Intervenors-Appellants, et al., Intervenor.

Claude Platton, for appellant. 
Cesar Z. Ruiz, for intervenors-appellants. 
Michael Y. Hawrylchak, for respondents.
New York Immigration Coalition et al., Richard Briffault et al., Common Cause New York, Ron Hayduk, New York Civil Liberties Union Foundation, D mos, amici curiae.

WILSON, Chief Judge:

On December 9, 2021, the New York City Council passed a bill entitled "A Local Law to amend the New York city charter, in relation to allowing lawful permanent residents in New York city to vote in municipal elections." Shortly thereafter, Mayor Bill de Blasio left office without signing or vetoing the bill. Upon taking office on January 1, 2022, Mayor Eric Adams also neither signed nor vetoed it. Accordingly, pursuant to section 37 (b) of the New York City Charter, the bill became effective on January 9, 2022 as Local Law 11.
Local Law 11 granted some noncitizens the right to vote in certain elections for elective offices in New York City. The same day Local Law 11 became effective through Mayoral inaction, plaintiffs brought this action seeking to declare Local Law 11 null and void on the grounds that it violates the New York State Constitution, the New York State Election Law, and the Municipal Home Rule Law. We hold that Article II, Section 1 of our Constitution limits voting to citizens, and affirm on that ground.
I.
Local Law 11 allows "municipal voters" to vote in New York City elections for the offices of Mayor, Public Advocate, Comptroller, Borough President and City Council Member (New York City Charter §§ 1057-aa, 1057-bb). The law defines a municipal voter as "a person who is not a United States citizen on the date of the election on which he or she is voting," and who: (1) "is either a lawful permanent resident or authorized to work in the United States"; (2) "is a resident of New York city and will have been such a resident for 30 consecutive days or longer by the date of such election"; and (3) "meets all qualifications for registering or preregistering to vote under the election law, except for possessing United States citizenship, and who has registered or preregistered to vote with the board of elections in the city of New York under this chapter" (id. at § 1057-aa [a]).
Plaintiffs, a group of current and former elected officials, individuals and entities representing or associated with the Republican Party, and a group of New York City registered voters, brought this action against the New York City Council, Mayor Eric Adams and the New York City Board of Elections. Plaintiffs challenged the law and sought declaratory judgment on three bases: First, that Article II, section 1 of New York's Constitution limits voting to citizens; second, that Election Law § 5-102 (1), which does the same by providing that "[n]o person shall be qualified to register for and vote at any election unless he is a citizen of the United States," cannot be superseded by a local law; and third, that Local Law 11 violates Municipal Home Rule Law § 23 (2) (e) because it constitutes a change to the "method" of voting, a change which requires a public referendum that was not conducted here [FN1]. A group of noncitizens who qualified as municipal voters under Local Law 11 intervened as defendants to support its constitutionality.
Supreme Court granted plaintiffs' motion for summary judgment on all three grounds, granted the requested declaratory judgments, and permanently enjoined the City from implementing the law. The Appellate Division modified the judgment as to the Election Law claim, and, as so modified, affirmed, with a single justice dissenting (225 AD3d 98 [2024]). The City Council and Intervenors appealed as of right to this Court pursuant to CPLR 5601 (b) (1).
II.
A.
The first question is whether Article II, section 1 of New York's Constitution limits voting to citizens. The text of that Article makes clear what our case law has long held: Article II, section 1 restricts voting to citizens.
"[W]e [are] guided by the familiar principle of our jurisprudence that the courts are reluctant, and it is only as a last resort, that they will strike down a solemn legislative enactment on the ground that it is unconstitutional" (Matter of Ahern v South Buffalo Ry. Co., 303 NY 545, 555 [1952]). That principle applies to local legislative enactments as well as those of the state legislature (see e.g., Police Benevolent Assn. of the City of New York, Inc. v City of New York, 40 NY3d 417, 427 [2023]; Lighthouse Shores, Inc. v Town of Islip, 41 NY2d 7, 11 [1976]). "The question in determining the constitutionality of a legislative action is therefore not whether the State Constitution permits the act, but whether it prohibits it" (Stefanik, [*2]___NY3d___, 2024 NY Slip Op 04236, *3). It is the "responsibility of the courts" to define the rights and prohibitions set forth in the State Constitution, "which constrain the activities of all three branches" of the government (Board of Educ, Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 39 [1982]).
Reading Article II as a whole, it is facially clear that only citizens may vote in elections within the State of New York. Article II of the Constitution governs "Suffrage." Section 1, titled "Qualifications of voters," states,
"Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election" (NY Const, art II, § 1).
Appellants urge that Article II, section 1 merely provides a floor, guaranteeing that citizens may vote in all elections but not prohibiting voting by others. Under that interpretation, municipalities are free to enact legislation that would enable anyone to vote—including, as counsel for appellants stated during oral argument, thirteen-year-old children. That reading is incompatible with other portions of Article II.[FN2] Section 5 requires the promulgation of laws "for ascertaining, by proper proofs, the citizens who shall be entitled to the right of suffrage hereby established." Likewise, section 7 provides that "all elections by the citizens . . . shall be by ballot."[FN3] Under appellants' construction, municipalities must require citizens to vote by ballot, but would be unfettered in the means they decide to use for noncitizen voting. Each of those constitutional provisions presumes that the franchise is limited to citizens. If the Constitution guaranteed the right of suffrage to persons other than citizens, it would be unusual, to say the least, to set forth requirements to ascertain proper proofs and to vote by ballot that apply to only citizens and not noncitizens.
Instead, it is plain from the language and restrictions contained in Article II that "citizen" is not meant as a floor, but as a condition of voter eligibility: the franchise extends only to citizens whose right to vote is established by proper proofs and who vote by ballot (subject to section 7's exceptions). From Article II's provisions stating that "[e]very citizen shall be entitled to vote" (id. § 1), that "elections [are] by the citizens" (id. § 7) and that the legislature's duty and power is to enforce and realize the franchise held by "the citizens who shall be entitled to the right of suffrage hereby established" (id. § 5), Article II provides for election by—and only by—citizens.
That conclusion is hardly new. In People ex rel. Smith v Pease, we explained:
"The Constitution of this State declares who may exercise the elective franchise. Those entitled to vote at any election are, every male citizen of the age of twenty-[*3]one years who shall have been a citizen for ten days and an inhabitant of this State for one year next preceding any election, and for the last four months a resident of the county where he may offer his vote. It follows that none others than those possessing these qualifications can lawfully vote" (27 NY 45, 52-53 [1863] [citing 1846 NY Const, art II, § 1]).
Our language—that the Constitution declares "who may exercise the elective franchise . . . at any election," and provides that "none others . . . can lawfully vote" (id.)—is definitive and determinative [FN4]. We reiterated the firm limit restricting voting to citizens in Matter of Hopper v Britt, in which we reiterated that "[t]he qualifications of voters are prescribed by section 1 of article 2 of the Constitution and those qualifications are exclusive" (203 NY 144, 150 [1911]).[FN5]
B.
Appellants' additional arguments in support of the proposition that Article II is a floor, not a ceiling, are unavailing. First, appellants point to several statutes, enacted before the Civil War, that use the word "inhabitants" rather than "citizens," and suggest those statutes evince a legislative understanding that the Constitution's use of "citizen" was merely a floor. There are several problems with that argument. First, appellants have fundamentally misunderstood those statutes, which disenfranchised citizens who (1) were not inhabitants of a locality where an election would take place; and/or (2) were not taxpayers, even if they were citizens. For example, an 1832 law provided that only "a taxable inhabitant" of Geneseo village could vote on certain ballot propositions in Geneseo village elections (L 1832, ch 217 § 12); an 1842 law provided that no one could vote in a Lansingburgh village election unless he paid a road tax (L 1842, ch 127, § 1); an 1857 law restricted voting in Newport town elections to every "inhabitant" who owned property in or paid taxes to that town (L 1857, ch 148 § 5). It would have been nonsensical to limit voting to "citizens" of Geneseo, Lansingburgh or Newport, because no one is a "citizen" of a town or village. One may "reside," "inhabit" or be otherwise present in a locality, but the use of such words in those statutes cannot be understood as a legislative recognition that the Constitution permitted people other than citizens to vote.
Second, the subsequent enactment of these statutes says little or nothing about their constitutionality, which was never tested by any lawsuit in which a noncitizen resident of some municipality attempted to vote. Finally, it takes but a moment to understand that these statutes were designed to disenfranchise citizens, not enfranchise noncitizens. Those statutes limited voting in local elections to inhabitants who paid taxes to a locality as a way of further imposing qualifications on voters—not overruling Article II's meaning of "citizen."
Appellants misread our analysis of a similar restriction in Spitzer v Village of Fulton (172 NY 285 [1902]) as suggesting that Article II does not govern local elections. In that case, the plaintiffs sued the Village of Fulton to recover a $1,000 deposit they had paid to secure their performance of a bid to purchase bonds to be issued to finance the Village's construction of municipal water works. The plaintiffs ultimately were awarded the right to purchase the bonds but reneged. The Village refused to return the deposit, retaining it as liquidated damages under the bid terms. The plaintiffs argued that the state statute authorizing the issuance of the bonds violated Article II, section 1 of the Constitution because it placed an additional, [*4]property-ownership requirement to vote at the Village's elections on ballot propositions related to the water works. We held that Article II, section 1 did not prohibit the Legislature from requiring additional voter qualifications in this narrow category of local elections:
"The obvious purpose of [Article II] was to prescribe the general qualifications that voters throughout the state were required to possess to authorize them to vote for public officers or upon public questions relating to general governmental affairs. But we are of the opinion that that article was not intended to define the qualifications of voters upon questions relating to the financial interests or private affairs of the various cities or incorporated villages of the state, especially when, as in this case, it relates to borrowing money or contracting debts" (id. at 289).
Far from supporting appellants, Spitzer expressly states that Article II defines the general qualifications to vote even in local elections such as those at issue here. It further holds that, for a limited type of local ballot proposition not at issue here—"financial interests or private affairs . . . [that] relate[] to borrowing money or contracting debts"—Article II does not prohibit the legislature from authorizing local governments to impose certain additional voter-eligibility qualifications beyond citizenship. The elections at issue on this appeal are elections for "public officers or upon public questions relating to general governmental affairs," not for "the financial interests or private affairs" of localities (id.).[FN6]
Moreover, Spitzer's rationale for determining that the legislature could impose additional requirements in that narrow category rested in part on the 1894 Constitution's Article XII, section 1 (now codified in amended form at Article VIII, section 12), which required the legislature to "provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and in contracting debt by such municipal corporation." Spitzer read Article II and Article XII together to hold that the additional voter qualifications imposed by the legislature were permissible. The Article XII power on which we relied in Spitzer was moved to Article VIII, section 12 in 1963, adding the following language, inter alia: "The legislature shall not, however, restrict the power to levy taxes on real estate for the payment of interest on or principal of indebtedness therefore contracted."
Thus, all we decided in Spitzer was that former Article XII, section 1 authorized the legislature to impose a property-holding restriction for voting in a local election respecting a locality's own "financial interests or private affairs," to ensure that those entitled to vote are the ones "liable to be taxed for the payment of such debts" (id. at 289-290). It has no application here.[FN7]
We note, too, that the text and history of Article II, section 1 do not support the view that it is broadly inapplicable to local governments (see 4 Charles Z. Lincoln, The Constitutional History of New York at 188-189 [1905] [noting that the People rejected a proposed amendment making explicit that Article II, section 1 applied to ballot question "submitted to the vote of the people of the state," thus preserving the existing understanding that the provision did not "exclude municipal corporations from (its) operation"]).
Appellants and the dissent also point to two of our decisions upholding local laws relating to elections for New York City councilmembers. But those cases do not concern who is eligible to vote—they concern for whom eligible voters may vote and the districts in which candidates run. In Johnson v City of New York, we held that Article II, section 1 permitted the removal of district lines within a borough and the limitation that each voter could vote for only one candidate even when multiple seats were at stake (see 274 NY 411, 416-417 [1937]). Next, Matter of Blaikie v Power rejected the argument that a charter amendment "providing that a voter may vote for only one of the two candidates for the offices of councilmen at large from his borough . . . deprives him of a right to vote for a candidate of his choice for both of the elective offices to be filled and thereby offends against section 1 of article II of our State Constitution" (13 NY2d 134, 139 [1963]). Indeed, in Blaikie, we noted that Johnson "expressly [held] that the purpose of the constitutional provision was solely to remove the disqualifications which attached to the person of the voter in earlier times and thereby assure to a citizen, qualified by age and residence, the same right to vote as every other similarly qualified voter possessed" (id. at 140 [emphasis added]).[FN8]
For the above reasons, we cannot read Article II as providing a floor, allowing municipalities to enfranchise whomever they please. Instead, it precisely defines who may vote, restricting the franchise to citizens.
III.
The determination that Article II restricts voting to citizens does not resolve this appeal. The next question is whether Article IX of the Constitution, which grants local governments expansive home rule powers, created an exception to Article II's restriction on voting. As appellants correctly point out, Article IX was enacted long after Article II, and it provides that the "[r]ights, powers, privileges and immunities" that it confers on local governments "shall be liberally construed" (NY Const, art IX, § 3 [c]).
Additionally, in other contexts we have affirmed that Article IX grants local governments broad powers to manage their own affairs, which can be displaced by the legislature only in ways contemplated by the Constitution (id., § 2 [b], [c]; see e.g., Greater N.Y. Taxi Assn. v State of New York, 21 NY3d 289, 300-301 [2013]; DJL Rest. Corp. v City of New York, 96 NY2d 91 [2001]; City of New York v Patrolmen's Benevolent Assn. of City of N.Y., 89 NY2d 380, 387 [1996]).
Appellants and the dissent contend that even if Article II once restricted voting to citizens, Article IX's enactment in 1963 overrode Article II and our decisions in Pease and Hopper—and that if Article II imposed "such a drastic limitation on home rule," it could not do so just by implication (dissenting op at 2, 31). They misread the Constitution. Article IX further reinforces the constitutional bar on noncitizen voting by expressly incorporating Article II, section 1.
Article IX, section 1 (a) requires that "[e]very local government, except a county wholly included within a city, shall have a legislative body elective by the people thereof." Article IX, section 1 (b) similarly requires that "[a]ll officers of every local government whose election or appointment is not provided for by [*5]th[e] constitution shall be elected by the people of the local government, or of some division thereof," or appointed by local officials if such appointment is provided for by law. Appellants contend that the Constitution's use of the phrase "elective by the people thereof" instead of "elective by the citizens thereof" overrides Article II's restriction providing that only citizens may vote. The difficulty with that argument is the same as with the pre-Civil War statutes discussed earlier: Article IX uses "elective by the people thereof" and "elected by the people of the local government, or of some division thereof" to impose a geographic restriction so that voters cannot vote for a local official if they do not reside within the locality (NY Const art IX § 1 [a], [b]). The use of the word "people" instead of "citizen" in Article IX does not represent the rejection of citizenship as a necessary condition of voting. Because no one is a citizen of Westchester County, Rochester or any other locality, it would not have made sense for Article IX to say, "elected by the citizens thereof" or "elected by the citizens of the local government."
The insuperable problem for appellants' interpretation is that Article IX, section 3 defines "People" as "[p]ersons entitled to vote as provided in section one of article two of this constitution" (id. § 3 [d] [3]; emphasis added). By expressly defining "People" to refer back to Article II, section 1, which restricts voting to "citizens" only, Article IX not only cabins its own scope to that specified by Article II, section 1, but it also reinforces the understanding that Article II, section 1 states a finite definition of who may vote, not just a floor above which localities can enfranchise other voters.
To overcome Article IX's explicit incorporation of Article II's requirement that only citizens may vote, appellants point to the entirety of Article IX's definitional section 3 (d), which reads:
"(d) Whenever used in this article the following terms shall mean or include:
(1) 'General law.' A law which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages.
(2) 'Local government.' A county, city, town or village.
(3) 'People.' Persons entitled to vote as provided in section one of article two of this constitution.
(4) 'Special law.' A law which in terms and in effect applies to one or more, but not all, counties, counties other than those wholly included within a city, cities, towns or villages" (NY Const, art IX, § 3 [d]).
Appellants contend that because the prefatory language uses the phrase "mean or include" and not just "mean," the definitions allow other, unspecified meanings. However, this argument would not make sense if applied to all of the defined terms in section 3. For the definition of "General law" to "include" but not be limited to the definition would render the definition meaningless—a general law would "include" a law that applies alike to all Counties but could "include" any other law (id. § 3 [d] [1]). Recognizing that problem, although not mentioned in their briefs, appellants suggested at oral argument that "mean or include" may not refer to each of the defined terms that follow it, but only to the definition of "People," because, in their view, that definition is the one most susceptible of an expansive reading.
That argument suffers from several defects. First, there is nothing in the text of the section that suggests the prefatory phrase applies only to a subset of the defined terms; the suggestion that it does is an attempt to evade the fact that noncitizen voting makes no sense on the face of the section as written. If, as the dissent urges, we must read the statute exactly as written, there is no basis to choose whether to apply "mean" or "include" to each defined term, and choosing "include" as appellants would makes no sense when applied to at least some of the definitions. Second, there is no reason to think that, if "include" applies to [*6]fewer than all four defined terms, it would most likely be directed at the definition of "People." Unlike the other three defined terms, "People" refers back to a different section of the Constitution that provides a concrete definition. Indeed, if there were any candidate among the four to which "include" might most appropriately apply, it would be the definition of "Local Government," because, beyond the types specifically enumerated (county, city, town or village), there are other forms of local government that might have a legislative body or other officers elected by the people, such as a water district, a garbage district, or a school district. Third, it belies the purpose of a definitions section—already rare in the New York Constitution—if the definitions do not, in fact, fix the meanings of the defined terms.
Finally, there are innumerable statutory uses of the phrase "means and includes" (see e.g., Vehicle and Traffic Law § 114-a; General Business Law § 511 (1); Alcohol Beverage Control Law § 3; Tax Law § 186-a). As is the case here, reading "include" as an expansive term would render many such definitions meaningless. Contrary to appellants' proposition, the phrase is used in statutes as a term of art to indicate that a definition is comprehensive, not that "includes" should allow for the expansion beyond the defined terms. Reading "includes" in these many statutes to allow expansion beyond the definitions would render them meaningless.
"Means and includes" is similar to legal and colloquial expressions like "whether or not," "cease and desist," "past history," "free gift," "end result" or countless other redundant expressions that have worked their way into common parlance as well as into legal expression.[FN9] The tortuous convolutions appellants would have us suffer to evade the plain language of Article IX demonstrate the unsoundness of their argument. Even the direction to construe Article IX liberally does not authorize erasing the limitations Article IX itself imposes (see e.g., Makinen v City of New York, 30 NY3d 81, 88-89 [2017] [command to liberally construe statute cannot overcome statute's plain meaning]).
IV.
Intervenors and amici New York Civil Liberties Union contend that New York State citizenship is, or at least can be, broader than U.S. citizenship. They point to the New York Constitution's use of "citizen" and "citizen of the United States" in different places as well as to the history of voting by African Americans in New York. They argue that if we read the word "citizen" across the text of the New York Constitution, the text plainly distinguishes between United States citizens and New York citizens. They point to the eleven uses of the word "citizen" with no qualifier and three uses of "citizen of the United States" to suggest that Article II does not require U.S. citizenship to vote.
To begin, that argument is disconnected from the issue in this case. Even if someone could be a citizen of New York State without being a citizen of the United States, Local Law 11 does not purport to enfranchise citizens of New York who are not citizens of the United States—it purports to enfranchise noncitizens with no reference to any idea of New York State citizenship. There is no known procedure for someone who is not a citizen of the United States to be a citizen of New York, and, even were there, Local Law 11 does not purport to enfranchise those persons.
Article II, section 1 states that "[e]very citizen shall be entitled to vote at every election" (NY Const art II, § 1). Pointing to other constitutional provisions that expressly refer to citizens of the United States (see e.g. NY Const art I, § 1), the Intervenors and amicus say that "citizen" must mean "citizen of the state." If the provision was intended to limit suffrage to citizens of the United States, so the argument goes, it would include the phrase "citizen of the United States," as other provisions do. But just as it uses "citizen of the United States," the New York Constitution elsewhere specifically refers to "citizens of the state" (see NY [*7]Const art III, § 19), undermining any argument that the word "citizen," standing alone, necessarily means "citizen of the state." The text alone cannot resolve the meaning of that term.
It is, therefore, helpful to review our constitutional history. The requirement that a voter be a "citizen" has existed since 1821, when the State adopted its Second Constitution. Article II, section 1 of that Constitution distinguished between "citizen[s]" and "citizen[s] of this state" (1821 NY Const art II, § 1). That provision imposed additional durational requirements on free people of color residing in the state [FN10]. Although no historical evidence bears on whether the framers intended the distinction to capture different concepts of citizenship, the co-existence of the two terms in the same constitutional provision suggests that "citizen" did not mean "citizen of the state." That inference is confirmed by subsequent constitutional history, which shows that the term "citizen" has long been understood to mean "citizen of the United States."
Restrictions on suffrage, including the citizenship requirement, were heavily debated during the Constitutional Convention of 1867. Horace Greeley, "chairman of the 'committee on the right of suffrage and the qualifications to hold office' " proposed an "article on suffrage" that would have "modified in many important respects the existing constitutional provisions on this subject" (2 Lincoln, The Constitutional History of New York at 294-295). Among other modifications, the proposal would have substituted the phrase "citizen of the United States" for "citizen" (see id. at 295). From the Convention's rejection of that amendment, perhaps animated by a delegate's speech denouncing the amendment as one that would disenfranchise African Americans in New York (Proceedings and Debates of the Constitutional Convention of the State of New York Held in 1867 and 1868, 517-518), intervenors draw the conclusion that "citizen" in our Constitution means "New York state citizen" and not "citizen of the United States."
The failure of the proposed amendment cannot be understood to have altered the meaning of the citizenship requirement in our Constitution. Moreover, at the time of the 1867 Convention, the status of U.S. citizenship was unsettled, and there was no reason to take affirmative steps to tether New York's Constitution to it.[FN11] There was no definition of citizenship in the U.S. Constitution; whether citizenship was determined by state or federal law was controversial (see Dred Scott v Sandford, 60 US 393, 15 L Ed 691 [1857], superseded [1868]); the constitutionality of the Civil Rights Act of 1866, which created a statutory right to U.S. citizenship, was in doubt; and the Fourteenth Amendment, which provides that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside," had not been ratified, and was the subject of a fraught ratification process. Just as the New York Constitutional Convention wrapped its work in February 1868, New Jersey and Ohio purported to withdraw their ratifications of the Fourteenth Amendment. It was not until July 20, 1868, that the Fourteenth Amendment was conclusively adopted—well after the New York Constitutional Convention had disbanded. Thus, the 1867 Constitutional Convention's rejection of the amendment appending "of the United States" to "citizen" furnishes no support for intervenors' argument.[FN12]
We also note that, during the 1894 Constitutional Convention, the delegates debated (and rejected) resolutions identifying 16 other states that allowed voting by certain non-U.S. citizens, "thus permitting persons to participate in the government of this country who are subjects of a foreign power, and who owe allegiance neither to the state nor to the United States, thereby giving rise to occasions when the vote of aliens may change the course of government," and urging Congress to propose a federal constitutional amendment "requiring all voters to be citizens, and prohibiting any state from granting the right of suffrage to any person who is not a citizen of the United States" (3 Lincoln, The Constitutional History of New York at 74-79). The proponents of the resolutions, in urging adoption, made clear "that New York had steadily adhered to the principle of citizen suffrage" that did not allow non-U.S. citizens to vote (id. at 77). Although neither resolution was adopted (for fear of being perceived as "meddling improperly with the affairs of the Federal Government" or as "a discourteous criticism upon the Constitution of our sister states" [id. at 76]), the debate was animated by a common understanding that the New York Constitution restricted the franchise to U.S. citizens (see id. at 74-79).[FN13]
Article II, section 1 has been amended several times since 1894, but the citizenship requirement has persisted. There is no evidence that any of the amendments changed the understanding that a voter must be a citizen to vote in New York.
V.
Nearly 200 years ago, Alexis de Tocqueville observed:
"When a people begins to touch the electoral qualification, one can foresee that it will sooner or later make it disappear completely. That is one of the most invariable rules that govern societies. As one moves the limit of electoral rights back, one feels the need to move it back more; for after each new concession, the forces of democracy increase and its demands grow with its new power. The ambition of those who are left below the property qualification becomes irritated in proportion to the great number of those who are found above. The exception finally becomes the rule; concessions succeed each other relentlessly and there is no stopping until they have arrived at universal suffrage" (Democracy in America: Vol 1 ch IV, at 55 [Harvey C. Mansfield & Delba Winthrop, trans, U. Chicago 2002] [1831]).
Americans have fought over the meaning of citizenship and the right to vote since the earliest days of our Republic. As de Tocqueville predicted, history has moved toward expansion of both, sometimes in broad leaps, as in the Reconstruction and Nineteenth Amendments, and sometimes incrementally—occasionally with a step or two backwards. Whatever the future may bring, the New York Constitution as it stands today draws a firm line restricting voting to citizens. Accordingly, the order of the Appellate Division insofar as appealed from should be modified, without costs, in accordance with this opinion and, as so modified, affirmed.

RIVERA, J. (dissenting):

"Effective local self-government and intergovernmental cooperation are purposes of the people of the state" (NY Const, art IX, § 1 ["Bill of rights for local governments"]).
"The idea that local officials should be chosen by local constituencies is one with deep roots in our democratic polity. . . . [New York's] home rule article and statutes receive their inspiration from the deeply felt belief that local problems should, so long as they do not impinge on affairs of the people of the State as a whole, be solved locally" (Matter of Resnick v County of Ulster, 44 NY2d 279, 285, 288 [1978] [internal citations omitted]).
Article IX of the New York State Constitution and the Municipal Home Rule Law grant localities broad authority to structure their own governments and elections to enhance accountability and serve the unique needs of their residents. The New York City Council relied on that authority to enact Local Law 11, which purports to allow noncitizen lawful permanent residents and people authorized to work in the United States to vote in local elections as "municipal voters." The question on appeal is whether there is any legal impediment to the City Council's action. I disagree with the majority's conclusion that Local Law 11 violates Articles II and IX of the State Constitution. To the contrary, the State Constitution recognizes the primacy of home rule control over this core issue of local autonomy.
The majority's holding relies on a reading of Article II, section 1 that ignores its plain text. That provision guarantees that "every citizen shall be entitled to vote" if they meet certain age and residency requirements. It is a declaration of an affirmative right that does not prohibit localities from exercising their home rule authority to enfranchise noncitizens. The drafters of Article II, section 1 would not impose such a drastic limitation on home rule by mere implication, as the majority reads it, but would only have done so expressly. Nor does any other provision of the State Constitution support the majority's convoluted explanations for why we should ignore the actual words in Article II, section 1, and replace them to read that "only citizens" can vote in local elections. The only disenfranchisement provision in the State Constitution is Article II, section 3, which excludes "persons" convicted of certain crimes from the right of suffrage. That section uses the term "persons," rather than "citizens," to ensure that it covers any noncitizens convicted of those crimes whom localities might otherwise enfranchise in local elections. Article II, sections 5 and 7, specify statewide election procedures for citizen voters, without preempting any local laws that permit noncitizens to vote in local elections alongside citizens. In short, Article II works seamlessly with Article IX to allow localities to expand the franchise to noncitizen members of their communities to vote on local matters. Thus, Local Law 11 does not violate the State Constitution. Moreover, the State Election Law imposes no impediment to Local Law 11. While the Election Law permits only United States citizens to register and vote, it expressly allows localities to exercise their home rule authority and supersede this requirement.
However, Local Law 11 is not self-effectuating. By its terms, the law requires that the City implement extensive changes to its registration and election procedures to accommodate municipal voters. It goes so far as to define the means that the Board of Elections (BOE) adopts for "municipal voter registration" as a "method." The law therefore constitutes a change in the "method" of electing local public officers within the meaning of Municipal Home Rule Law § 23 (2) (e), which requires approval by local referendum for any [*8]such change. Since no referendum was put to the People of the City of New York, Local Law 11 is null and void, and I would affirm the Appellate Division solely on that ground.[FN14]
I.
Local Law 11 Enfranchises Noncitizens Lawfully Present in the United States and New York to Vote in Municipal Elections
On December 9, 2021, the City Council amended the City Charter with the purpose of "allowing lawful permanent residents in New York City to vote in municipal elections." The amendment, titled Local Law 11, enfranchised a class of noncitizens designated "municipal voters," consisting of any person who: (1) holds lawful permanent residence or is lawfully authorized to work in the United States; (2) has resided in New York City for at least 30 consecutive days leading up to an election; and (3) satisfies "all qualifications for registering or pre-registering to vote under the [E]lection [L]aw, except for possessing United States citizenship, and who has registered or pre-registered to vote with the board of elections in the city of New York under this chapter" (New York City Charter Ch 46-A [hereinafter "ch 46-A"], § 1057-aa). Local Law 11 permits municipal voters to vote in all "municipal elections," relevantly defined as "any general, primary, or run-off election," "any special election" for mayor, public advocate, comptroller, borough president, and council member, and any municipal referendum (see id. §§ 1057-aa, 1057-bb).
Local Law 11 would vastly expand the franchise in New York City, a locality that is home to approximately 3.1 million immigrants, of whom 27 percent (over 800,000) are lawful permanent residents or hold another form of lawful status.[FN15] It provides a means for this significant part of the City's population to have a voice in their government.
II.
Plaintiffs, who include certain registered voters, current and former elected officials, and representatives of the Republican Party, sued to declare Local Law 11 unconstitutional and in violation of the Election and Municipal Home Rule Laws. Defendants—the Mayor, City Council, and the BOE—and certain putative municipal voter intervenors [FN16] responded that Local Law 11 is a wholly lawful exercise of home rule [*9]control over local elections. For the reasons I discuss infra, Local Law 11 survives plaintiffs' constitutional challenges, but it fails to comply with Municipal Home Rule Law § 23 (2) (e).
A.
Standard of Review
"It is well settled that facial constitutional challenges are disfavored. Legislative enactments enjoy a strong presumption of constitutionality . . . [and] parties challenging a duly enacted statute face the initial burden of demonstrating the statute's invalidity beyond a reasonable doubt" (Overstock.com, Inc. v New York State Dept. of Taxation & Fin., 20 NY3d 586, 593 [2013], quoting LaValle v Hayden, 98 NY2d 155, 161 [2002] [internal quotation marks omitted]). "It has been our repeated admonition . . . that 'legislation should not be declared unconstitutional unless it clearly appears to be so' and that 'all doubts should be resolved in favor of the constitutionality of an act' " (White v Cuomo, 38 NY3d 209, 228-229 [2022], quoting Johnson v City of New York, 274 NY 411, 430 [1937]). We may only hold that a law is unconstitutional "after 'every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible' " (id. at 216, quoting Matter of Fay, 291 NY 198, 207 [1943]). The strong presumption of constitutionality applies to local laws just as it does to state laws (see Johnson, 274 NY at 430 [a provision of the New York City Charter did not violate the State Constitution, as "all doubts should be resolved in favor of the constitutionality of an act" and "the wisdom of legislation is not for us to determine"]; 41 Kew Gardens Road Associates v Tyburski, 70 NY3d 325, 333 [1987] ["(A) duly enacted local law is clothed with the presumption of constitutionality that applies to State legislative enactments"] [internal citations omitted]). Moreover, "the Legislature . . . has empowered municipalities to legislate in a wide range of matters relating to local concern. So long as local legislation is not inconsistent with the State Constitution or any general law, localities may adopt local laws . . . except 'to the extent that the legislature shall restrict the adoption of such a local law' " (Albany Area Builders Assn. v Town of Guilderland, 74 NY2d 374, 378 [1989] [internal citations omitted]).
Plaintiffs have not met their heavy burden. The State Constitution and State law do not prohibit a locality from enfranchising noncitizens in elections for local public officers and on municipal issues. To the contrary, the Constitution specifically authorizes municipal self-governance, and so the City could exercise this power to enact Local Law 11—but only by referendum.
B.
Article IX and State Law Establish the Primacy of Home Rule
Home rule has long existed in New York State and is the basis for local control over the structures of local government. "The theory behind home rule is very simple: it is the thought that local problems, in which the State has no concern, can best be handled locally" (Baldwin v City of Buffalo, 6 NY2d 168, 172 [1959]). The constitutional home rule provision set forth in Article IX, Section 1 (a), titled the "Bill of Rights for Local Governments," declares that "[e]ffective local self-government and intergovernmental cooperation are purposes of the people of the state." To achieve those purposes and affirm the primacy of home rule, Article IX declares that "in addition to those granted by other provisions of this constitution," "[e]very local government shall have power to adopt local laws as provided by this article" and "[a]ll officers of every local government whose election or appointment is not provided for by this constitution shall be elected by the people of the local government, or some division thereof, or appointed by such officers of the local [*10]government as may be provided by law" (NY Const, art IX, §§ 1 [a], 1 [b]). Thus, the "people" of a locality may vote for its local officers.
Article IX further commands that the "[r]ights, powers, privileges and immunities granted to local governments by this article shall be liberally construed" (NY Const, art IX, § 3 [c]). Home rule authority must therefore be given the most expansive reading permissible. Accordingly, limitations on self-governance must be express and not implied, because only a clear restraint on municipal control over local issues comports with this constitutionally mandated rule of broad construction. Article IX, section 3 (d) provides that "the following terms shall mean or include:
"(1) 'General law.' A law which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages.
(2) 'Local government.' A county, city, town or village.
(3) 'People.' Persons entitled to vote as provided in section one of article two of this constitution.
(4) 'Special law.' A law which in terms and in effect applies to one or more, but not all, counties, counties other than those wholly included within a city, cities, towns or villages" (NY Const, art IX, § 3 [d]).
Section 3's definitions section is written in the disjunctive—the terms listed therein "shall mean or include" the definition that follows. As the United States Supreme Court has explained, "[t]he terms 'means' and 'includes' are not necessarily synonymous . . . The natural distinction would be that where 'means' is employed, the term and its definition are to be interchangeable equivalents, and that the verb 'includes' imports a general class, some of whose particular instances are specified in the definition" (Helvering v Morgan's Inc., 293 US 121, 125 n 1 [1934]). Accordingly, the terms "mean" and "include" must each apply to different definitions in section 3 (d).
The term "include" must apply to the definition of "people," allowing localities to extend the franchise to local elections beyond the citizens whom Article II, section 1, grants an affirmative right to vote. Article IX, section 1 (a) declares among the "rights, powers, privileges and immunities" provided to localities that "[e]very local government . . . shall have a legislative body elected by the people," and section 1 (b) requires that "[a]ll officers of every local government whose election or appointment is not provided for by this constitution shall be elected by the people of the local government." Reading these provisions liberally, as we must under section 3 (c), the term "people" must be read to "include" the citizens whom Article II, section 1 entitles to vote, as part of a larger class of people whom localities may permit to vote in local elections if they conclude that doing so is the best way to promote local accountability and strengthen local governance.[FN17]
The majority asserts that "means or includes," as applied to "people" in Article IX, section 3 (d) must be read as limiting "people" to the citizens entitled to vote by Article II, section 1 (see majority op at 15). The majority's analysis is deeply flawed. First, the majority cites to statutes that use the conjunctive—"means and includes"—to claim that in such statutes, the phrase is a "term of art to indicate that a definition is comprehensive, not that 'includes' should allow for the expansion beyond the defined terms" (id. at 16). Of course, these statutes fail to illuminate the meaning of section 3 (d)'s disjunctive "means or includes," which is a different phrase raising different implications.[FN18] Second, the majority violates the rule of construction that we interpret language to give meaning to every word and avoid interpretations that render any word superfluous (see Mestecky v City of New York, 30 NY3d 239, 243 [2017]). The majority simply ignores that the word "includes" complements the word "means" and gives full meaning to certain terms defined in section 3 to maximize home rule authority.[FN19] Although the majority asserts that "there is no basis to choose whether to apply 'mean' or 'include' to each defined term" (majority op at 15-16), the proper reading of Article IX gives meaning to every word and considers each provision together, applies our routine tools of construction to determine without issue that "include" applies to "people."
Third, and most troubling, the majority's narrow reading of section 3 (d) disregards Article IX's command that we liberally construe home rule authority. Local control over local elections by local people is essential for "[e]ffective local self-government" (NY Const, art IX, § 1). Effective local self-government necessarily includes the right of local communities to choose who may vote for local public officials and local laws, and how best to ensure accountability of their elected representatives. The majority's approach erodes home rule in contravention of our State's commitment to local control.
Just as Article IX authorizes localities to structure their government to address local needs unless explicitly proscribed by the constitutional text, the Municipal Home Rule Law also provides for the primacy of local control, absent a superseding constitutional or state law provision (see Municipal Home Rule Law § 10 [1] [i]). The Municipal Home Rule Law states, "every local government [] shall have power to adopt and amend local laws not inconsistent with the provisions of the constitution or not inconsistent with any general law, relating to" the "mode of selection . . . of its officers and employees" (id. § 10 [1] [ii] [a] [i]).
As these provisions make clear, the People of the State of New York have chosen home rule primacy by empowering localities to order their affairs as they see fit based on their local interests and needs. To achieve that purpose, Article IX and the Home Rule Law must be read to maximize local control over local [*11]government unless inconsistent with an express constitutional or statutory limitation. As I discuss infra, neither the State Constitution nor the Election Law explicitly limit a locality's power to enfranchise noncitizens, lawfully present in New York, to vote in wholly local elections.
C.
Local Law 11 Is Consistent with Article II of the State Constitution
Article II, titled "Suffrage," sets forth constitutional requirements for voting.[FN20] Section 1, states,
"Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people, provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election" (NY Const, art 2, § 1).
By its plain terms, this provision enfranchises citizens who satisfy its age and residency requirements. The phrase "every citizen shall be entitled to vote" is an affirmative grant of the right to vote to citizens. It does not limit a locality's authority to expand the franchise to noncitizens. If such a restriction were intended, section 1 would simply use the unambiguous and clear words of limitation that "only citizens shall be entitled to vote." Article II, section 1 does not contain these words of limitation, and we may not add words to the State Constitution to manufacture a limitation that does not exist (cf. People v Finnegan, 85 NY2d 53, 58 [1995] ["We have firmly held that the failure of the Legislature to include a substantive, significant prescription in a statute is a strong indication that its exclusion was intended"]; Theroux v Reilly, 1 NY3d 232, 240 [2003] ["If the Legislature had intended to restrict" a statute's applicability, "it easily could have and surely would have written the statute to say so. We may not create a limitation that the Legislature did not enact"]).
Nevertheless, the majority asserts that Article II, section 1 requires that "only citizens may vote in elections within the State of New York" (majority op at 5). The majority's conclusion relies on unsupported reasoning that because citizens are enfranchised by section 1, everyone else is disenfranchised. That atextual interpretation makes little sense on its own terms. As I have explained, if the legislature intended Article II, section 1 to exclude those not mentioned, it would have said so expressly and not left such a significant matter to judicial inference (see Finnegan, 85 NY2d at 58).
The majority's reading of Article II, section 1 is also contrary to the history of this provision. Since it was first enacted in 1821, section 1 has only been amended to expand, not limit, the franchise to ensure that localities cannot impose restrictions on certain voters. Article II, section 1 initially guaranteed the right to vote only to white male citizens who were at least 21 years old, resided in New York State for one year prior to an election and in a particular county or town for six months, and met a property tax or public service [*12]requirement; and to Black male citizens who resided in New York State for at least three years and fulfilled a property requirement (see 1821 NY Const, art II, § 1). Just five years after its enactment, Article II, section 1 was amended to remove some of "[t]he qualifications of being a taxpayer or of rendering public service," although it retained a property requirement for Black men (Johnson, 274 NY at 418; 1846 NY Const, art II, § 1). By the 1938 Constitutional Convention, Article II, section 1 guaranteed the right to vote to "[e]very citizen of the age of twenty-one years, who shall have been a citizen for ninety days, and an inhabitant of [New York] for one year next preceding an election, and for the last four months a resident of the county and for the last thirty days a resident of the election district in which [they] may offer [their] vote" (1938 NY Const, art II, § 1). Since then, the minimum age and residency requirements have been lowered to expand the guaranteed right to vote (see NY Const, art II, § 1). This expanded constitutional guarantee of the right to vote has never come with a concomitant restriction on a locality's authority to extend the franchise to those who have been left out.
Other sections of Article II confirm that section 1 ensures suffrage for citizens while allowing localities to enfranchise noncitizens in local elections. Section 3 states,
"No person who shall receive, accept, offer to receive, or pay, offer or promise to pay, contribute, offer or promise to contribute to another, to be paid or used, any money or other valuable thing as a compensation or reward for the giving or withholding a vote at an election . . . . The legislature shall enact laws excluding from the right of suffrage all persons convicted of bribery or of any infamous crime" (NY Const, art 2, § 3).
The use of "persons" rather than "citizen" would be unnecessary unless someone other than a citizen could be enfranchised by a local law pursuant to Article IX. By excluding "persons," section 3 ensures that noncitizens—if entitled to vote under local law—comply with the State Constitution's antibribery mandate or else risk disenfranchisement. The provision would also preempt any local law that empowered noncitizens to vote, even if they were previously convicted of a disqualifying crime.
The majority's explanation that Article II, section 3 uses the word "persons" solely to encompass people who were convicted of bribery or any other disenfranchising crime before they became naturalized citizens is unpersuasive (see majority op at 12 n 8). The phrase "all citizens convicted of bribery or of any infamous crime" would plainly include such circumstances, and even if there were any doubt, the framers could have written, "all citizens ever convicted of bribery or of any infamous crime." Instead, the framers used a different term entirely, "persons," to "expand[] the provision as broadly as possible" (id.) and include noncitizens whom localities may enfranchise to vote in local elections.
Additionally, the recognized authority of localities to extend the franchise in local elections also explains the use of the term "citizen" in Article II, section 5. That section states,
"Laws shall be made for ascertaining, by proper proofs, the citizens who shall be entitled to the right of suffrage hereby established, and for the registration of voters; which registration shall be completed at least ten days before each election. Such registration shall not be required for town and village elections except by express provision of law" (NY Const, art 2, § 5).
This provision requires the legislature to enact a mechanism for citizens to exercise their guaranteed right to vote under section 1, by proving their citizenship. If they establish citizenship "by proper proofs" and fulfill the age and residency requirements, a locality cannot infringe on their right to vote. The laws that section 5 require therefore ensure an orderly process for those whom section 1 "entitled . . . the right of suffrage" to vote without interference by localities and, in doing so, necessarily singles out citizens. In contrast, section 5 requires laws for the uniform registration of "voters"—not just citizens—reflecting a recognition that localities may expand the franchise and that citizen and noncitizen voters alike must register before voting, [*13]except for expressly excluded town and village elections. Local Law 11 conforms with the mandates of section 5 by requiring municipal voters to fulfill the same registration requirements that apply to citizen voters.
Article II, section 7, similarly does not support the majority's reading of section 1 as prohibiting a locality from enfranchising its noncitizen residents. Section 7 states, in relevant part, "[a]ll elections by the citizens, except for such town officers as may by law be directed to be otherwise chosen, shall be by ballot, or by such other method as may be prescribed by law, provided that secrecy in voting be preserved." This provision protects voting by secret ballot. If a locality exercises its home rule authority to enfranchise noncitizens to vote in local elections alongside citizens—in other words, if it allows citizens and noncitizens to vote—section 7 will apply. There is no such thing as a pure "election by noncitizens" that falls completely outside the ambit of section 7 and would not require voting by secret ballot, because an election that excluded citizens would violate Article II, section 1.[FN21]
In sum, Local Law 11 is consistent with Article II, section 1, which guarantees the right to vote to citizens who fulfill the residency requirement. It does no more than that, as confirmed by its plain language and the language of other sections of Article II, as well as its history of extending its guarantee without ever imposing an express restriction on the right to vote. The majority's dubious reading of Article II results from its mischaracterization of the issue as whether the State Constitution "guarantee[s] the right of suffrage to persons other than citizens" (majority op at 6). No provision of the State Constitution guarantees that right, but nor does any provision prevent a locality from using its home rule authority allow noncitizens to vote in local elections.
D.
Our Precedent Recognizes the Constitutional Primacy of Home Rule
For more than a century, and before Article IX enshrined home rule in the State Constitution, we have strongly affirmed the authority to structure local elections as a locality sees fit. In Spitzer v Village of Fulton, plaintiffs deposited money with the Village of Fulton to secure the village's performance of a contract to purchase bonds (172 NY 285, 287 [1902]). The village intended to use the money it received from selling bonds to construct "a system of water works within its boundaries for the use of the [village] and its inhabitants" (id.). Under local law, only residents who owned (or whose spouses owned) property in the village were allowed to vote on the local proposition authorizing the bonds (id.). Although the village awarded the plaintiffs the bonds for which they deposited money, the plaintiffs refused to accept them and expressed their intent to rescind the contract (id.). After the village refused to return the plaintiffs' deposits, the plaintiffs sued (id.). They alleged that the state statute authorizing the local proposition violated Article II, section 1, which, at the time, guaranteed the right to vote to "[e]very male citizen of the age of twenty-one years" who met residency requirements, regardless of property ownership (id.).
The Spitzer Court concluded that the local law did not conflict with Article II, section 1, and confirmed that home rule controlled over the "financial interests and private affairs" of localities. It explained,
"The obvious purpose [of Article II, section 1] was to prescribe the general qualifications that voters throughout the state were required to possess to authorize them to vote for public officers or upon public questions related to [*14]general governmental affairs. But we are of the opinion that the article was not intended to define the qualifications of voters upon questions relating to the financial interests or private affairs of the various cities or incorporated villages of the state, especially when, as in this case, it relates to borrowing money or contracting debts" (172 NY at 289).
Thus, long before the 1963 adoption of Article IX, the Court recognized in Spitzer that localities have autonomy outside of the "general governmental affairs" of the State and that localities may control local elections concerning their "private affairs" (id. at 289-290). Spitzer's holding that Article II, section 1 does not apply to purely local concerns is not limited to taxation or local finances. The language in Spitzer is sweeping and allows for no such cabining of home rule [FN22]. Indeed, New York courts have consistently understood that local control of its "private affairs" extends to all manner of concerns, beyond a locality's finances (see e.g., Matter of Esler v Walters, 56 NY2d 306, 314 [1982] ["Limiting voter eligibility in water district elections to landowning residents does not violate those sections of the State Constitution specifically dealing with voter rights"]; Matter of Schulz v Horseheads Cent. School Dist. Bd. of Educ., 222 AD2d 819, 820 [3d Dept 1995] [holding that Article II, section 1 does not apply to local school district elections]; Turco v Union Free School Dist. No. 4, 43 Misc 2d 367 [Sup Ct, Nassau County 1964] [same]; In re Carrick, 183 AD 916, 916 [4th Dept 1918], affd 223 NY 621 [1918] [Article II, section 1 does not apply to "submitting the local option questions relating to the trafficking in liquor in cities"]).[FN23]
In Bareham v City of Rochester, a taxpayer residing in Rochester challenged the constitutionality of a local law that superseded various provisions of the city charter, including by modifying the structure of the city government from mayor-council to council-manager (246 NY 140, 144 [1927]). Although Bareham did not involve a challenge under Article II, section 1, the Court affirmed the quintessentially local nature of electing local officers, such as a mayor, and the authority localities possess to restructure their election processes (see id. at 149 ["The municipality is empowered to modify an election law in so far as that law affects the property, government or affairs of the municipality, i.e., in so far as it affects the election of local officers"]). Thus, Bareham is relevant to our analysis of Article II, section 1, because it is proof of our longstanding recognition that the election of local officers is a private affair.
The Court revisited Article II, section 1, in Johnson (274 NY 411). Johnson concerned a challenge to a New York City Charter provision implementing a system of proportional representation in city council elections (274 NY at 416-417). The provision limited voting to a single candidate out of a group running for city council at the borough level (id.). The Court, tasked with deciding whether the provision violated the Constitution, reviewed the history of Article II, section 1, which, when first enacted in 1821, "reluctantly let [*15]go of . . . property qualification[s]" that previously limited suffrage to landowners (id. at 417). In 1826, Article II, section 1 was amended by "removing completely all disqualification of voters," including limits based on taxpayer status or "rendering public service" (id.). The Court concluded, "[n]o one can read the history of these changes in the early Constitution without realizing that the object of the change in the law made by these two Constitutions was to remove the disqualifications which attached to the person of the voter" (id. at 418).
The Johnson Court quoted large portions of Spitzer's legal analysis, including its reference to "financial interests or private affairs" (274 NY at 418). It also surveyed the history of "[m]inority representation by voting" in New York, concluding, "[w]e can hardly imagine that [A]rticle II, section 1 of the Constitution forbade the election of aldermen of the City of New York under a minority representative system, and that the people for all these years slept upon their rights" (see id. at 421-423). Moreover, the Court rejected the contention that a prior case, Matter of Hopper v Britt (203 NY 144 [1911]), stood for the proposition that the City's experiment with city council elections was improper (id. at 423). The Court determined that Hopper was distinguishable because it involved "a limitation placed upon one voter which did not apply to another voter in the same district" (id.).[FN24] In contrast, the charter provision at issue in Johnson "treats all electors alike, and does not prevent a [person] from voting for the candidate of [their] choice" (id.). Thus, Article II, section 1 was not an impediment to the City's decision to modify its electoral process (see id.).
Several decades later, the Court addressed Article II, section 1, again in Matter of Blaikie v Power (13 NY2d 134 [1964]). Blaikie involved a challenge to a New York City charter provision that permitted the election of councilmembers at large, and implemented a form of "limited voting" wherein voters could select only one of two candidates on the ballot (13 NY2d at 138). A plurality considered the issue to be a straightforward application of Johnson (id. at 140), and it cited Johnson's review of the history of Article II, section 1 expanding suffrage, and Johnson's explanation of why Hopper was distinguishable (id. at 141). The plurality wrote that "[i]n the context of [Article II, section 1], limited voting and proportional representation are in substance and effect identical. . . . [E]ach system necessarily involves a limitation of voting, imposed on all voters alike, in order to make possible of achievement some minority representation in a multiple body" (id. at 143-144). Thus, the charter provision did not violate Article II, section 1 (see id.). One Judge concurred, writing that even if Article II, section 1 prohibited limited voting, it would not affect the charter provision, "because the constitutional provision is limited in its application to elections involving state officers or state issues," citing Spitzer (id. at 144 [Burke, J., concurring]). Johnson and Blaikie both support that Article II, section 1 merely sets a constitutional floor that guarantees the right to vote to citizens. In each case, the Court recognized a locality's authority to structure its own elections as it desires, so long as it treats voters equally and does not take away a citizen's right to vote for their preferred candidate. Local Law 11 does not thwart a citizen's right to vote or otherwise disenfranchise eligible voters. Quite the opposite. Local Law 11 expands the franchise for a population of New York City so that they may vote in local elections involving the City's "private affairs" and governance structure.
The majority relies on People ex rel. Smith v Pease (27 NY 45 [1863]) and Hopper (203 NY 144) to support its atextual reading, but both cases pre-date Article IX and our State's commitment by constitutional provision and statute to the primacy of home rule in local government matters, unless preempted by the State Constitution or state law. An analysis dependent on caselaw superseded by constitutional amendment is no analysis at all. Even setting that dispositive point aside, neither case involved a local or state law that expanded the franchise beyond Article II, section 1's constitutional floor. Thus, in Pease, which involved a dispute over the propriety of votes cast for treasurer in a county-wide election, the Court correctly observed [*16]that "none others than those possessing the[] qualifications" from Article II, section 1, could vote (27 NY at 53). There was no additional state or local law at issue that expanded the franchise, and no occasion for the Court to speculate on the propriety of such a law. Similarly, Hopper involved a challenge to the format of election ballots (203 NY at 149). The Court cited Article II, section 1 to explain that the Constitution guarantees the right to vote to those who are "qualified," and that "any system of election that unnecessarily prevents the elector from voting or from voting for the candidate of [their] choice violates the Constitution" (id. at 150). Such was the case in Hopper, where the ballot format improperly listed candidates nominated by more than one party in a way that unnecessarily prevented some voters from voting for the candidate of their choice (id. at 150). In full context, Hopper's reference to the qualifications in Article II, section 1 as "exclusive" was merely clarifying that if a voter possessed those qualifications, no law could impose an additional qualification or otherwise prevent them from voting.
III.
The Majority's Remaining Arguments
The majority's other arguments are similarly unpersuasive and border on the fantastic and implausible. The majority contends that if localities can enfranchise noncitizens, then Article II, sections 5 and 7, would not prevent localities from adopting criteria of their choosing as applied to noncitizens. That is exactly what home rule provides: localities may experiment with various forms of local government structure, including election criteria, because localities know best how to address local matters (see Johnson, 274 NY at 430 ["If the people of the city of New York want to try the system (of proportional representation), make the experiment, and have voted to do so, we as a court should be very slow in determining that the act is unconstitutional, until we can put our finger upon the very provisions of the Constitution which prohibit it."]; Resnick, 44 NY2d at 286 ["(E)ven in the era when a very narrow interpretation was given to (New York's) home rule provisions, municipalities were accorded great autonomy in experimenting with the manner in which their local officers . . . were to be chosen"]). This is a hallmark of our State democratic governance structure, not a weakness as the majority implies. Localities may experiment with their form of local elections as long as they do not run afoul of the State Constitution or state law. Moreover, as explained in Section II, supra, Article II, sections 5 and 7, when properly read are consistent with noncitizens voting in local elections.
By way of example of what the majority considers the horrors of local enfranchisement laws, it points to the defendants' and intervenors' concession at oral argument in response to a hypothetical that a locality could allow a 13-year-old to vote. Putting aside that Local Law 11 does not enfranchise children, but instead requires municipal voters to be 18 years of age, that the Council would enfranchise a 13-year-old is as unlikely as it is impossible. Minors lack many rights guaranteed to adults, and state law in many areas cedes a minor's decision-making authority to their parents or lawful guardians or significantly interferes in that decision-making authority.[FN25] Even if there were a remotely realistic possibility that localities would consider enfranchising their 13-year population, the State legislature can simply amend the Election Law to prohibit the locality from doing so, just as it may for any aspect of a local law that it considers at odds with statewide [*17]values or concerns. The Election Law already limits voting to 18-year-olds (see Election Law § 5-102). The legislature has not affirmatively prevented localities from superseding that limit, presumably because it does not believe that any locality would do so (see Section IV, infra).[FN26]
The majority additionally claims that the contrasting use of the phrase "citizen of the United States" in the New York Constitution, particularly in Article III, section 7, as well as evidence that delegates to the 1867 Constitutional Convention rejected an amendment to Article II, section 2 to make direct reference to federal citizenship, do not support the argument that the term "citizen," as used in Article II, section 2, refers to a state citizenship that is broader than federal citizenship and would encompass the municipal voters whom Local Law 11 sought to enfranchise (see majority op at 17-22). The majority reasons that when the framers drafted Article II, section 1, and when the delegates rejected the amendment at the 1867 Constitutional Convention, "the status of U.S. citizenship was unsettled, and there was no reason to take affirmative steps to tether New York's Constitution to it" (id. at 20). The majority observes that Article III, section 7, was adopted after the Fourteenth Amendment to the U.S. Constitution, which clarified U.S. citizenship (id. at 21 n 12). As the majority readily admits, this argument "is disconnected from the issue in this case" (id. at 17), because the City Council intended to enfranchise people whom they understood were not citizens within the meaning of Article II, section 1, whether the term "citizen" refers to federal or state citizenship. Regardless, the majority's historical discussion fails to account for the fact that the State Constitution referenced federal citizenship long before the Fourteenth Amendment. During the same Constitutional Convention in 1821 in which Article II, section 1 was first enacted, the framers simultaneously enacted Article III, section 2, which limited eligibility for governor to a "native citizen of the United States."[FN27]
IV.
Local Law 11 Does Not Violate the Election Law
Although Election Law § 5-102 sets a default rule that only citizens may vote in local elections, it does not prohibit localities from superseding that rule by enfranchising noncitizens through home rule authority. The Election Law governs all elections in New York (Election Law § 1-102). But it acknowledges the general primacy of home rule control over local elections, allowing local laws to govern unless it expressly preempts them. To that end, Election Law § 1-102 states that "[w]here a specific provision of law exists in any other law which is inconsistent with the provisions of this chapter, such provision shall apply [*18]unless a provision of this chapter specifies that such provision of this chapter shall apply notwithstanding any other provision of law."
In turn, Election Law § 5-102 (1) states that,
"No person shall be qualified to register for and vote at any election unless [they are] a citizen of the United States and [are] or will be, on the day of such election, eighteen years of age or over, and a resident of this state and of the county, city or village for a minimum of thirty days next preceding such election" (Election Law § 5-102 [1]).
Section 5-102 does not require application "notwithstanding any other provision of law." The phrase "any other law" clearly encompasses local laws such as Local Law 11, and there is no persuasive reason to depart from that plain meaning (see Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998] ["As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must be the language itself, giving effect to the plain meaning thereof"]). Thus, the Election Law does not impose a statutory impediment to the City Council exercising its home rule authority to enact Local Law 11.
V.
Local Law 11 Could Only Have Been Lawfully Adopted by Referendum
Under Municipal Home Rule Law § 23 (2) (e), "a local law shall be subject to mandatory referendum if it," relevantly, "changes the method of nominating, electing or removing an elective officer." As the City Council recognized, Local Law 11 can only be implemented by modification of various existing procedures for nominating and electing public officers. Accordingly, Local Law 11 imposes various comprehensive procedural requirements to ensure that the City's sizable population of eligible municipal voters has access to the ballot.
The BOE must "adopt all necessary rules and carry out all necessary staff training to carry out the provisions of" Local Law 11 (Ch 46-A, § 1057-cc). The BOE must also "produce a poll ledger or computer generated registration list that combines municipal voters and other U.S. citizen voters for each election district or poll site" (id. § 1057-dd [a]). If a municipal election coincides with any other election, the BOE "shall produce separate municipal ballots to be distributed only to municipal voters" (id. § 1057-dd [b]).
It also requires the BOE to "design and distribute a municipal voter registration form that will allow municipal voters to apply for registration, pre-registration, and change of enrollment" (Ch 46-A, § 1057-ee [a]). To maximize accessibility, the BOE must "translate the municipal voter registration application form into languages served by [the BOE] pursuant to state and federal law in a manner that is consistent with translations of the statewide application form" (id. § 1057-gg [b]). Municipal voters shall be permitted to submit a "municipal voter absentee ballot application form," and BOE must generate "separate municipal absentee ballots" when a municipal election and any other election fall on the same date (id. §§ 1057-hh [a], [d]). The BOE and the campaign finance board "shall coordinate efforts to ensure that municipal voter registration application forms are available at every location where New York state board of elections voter registration forms are made available" (id. § 1057-gg [a]). The BOE must also "create and implement a notification system for municipal voters" (id. § 1057-jj).
Local Law 11 also requires that the BOE and the campaign finance board "consult regularly with appropriate organizations, including advocacy groups and community associations, in the implementation of [the law]" (Ch 46-A, § 1057-oo). Moreover, "[t]here shall be an advisory group to provide recommendations [*19]regarding any problems or potential improvements with respect to municipal voting" (id. § 1057-tt [a]). The advisory group, which consists of five members, including the current public advocate, must annually "prepare a report of its findings and recommendations with respect to the voting process carried out under this chapter and submit such report to the mayor and speaker of the council" (id. § 1057-tt [g]). Indeed, Local Law 11 specifically refers to the BOE's implementation of the means by which it "registers or pre-registers new municipal voters" as "the method" for such registration (id. § 1057-aa [a]).
We have long "made clear that local governments have broad power to enact laws, and direct democracy in New York is the exception, not the rule" (Molinari v Bloomberg, 564 F3d 587, 609 [2d Cir 2009], citing McCabe v Voorhis, 243 NY 401, 413 [1926]). However, Local Law 11 requires the BOE to restructure the way it recognizes a numerous new population of voter and counts their vote in ways that implicate Municipal Home Rule Law § 23 (2) (e)'s referendum mandate. More than "extend[ing] existing methods of voting to an expanded electorate" (majority op at 3 n 1), Local Law 11 requires the BOE to create ballots listing a different combination of elections for different voters based on their citizenship status, produce a poll ledger or new registration lists, create an entirely new registration form, develop a notification system to reach municipal voters, hold trainings, consult with community organizations, and implement new rules necessary to fulfill the law's broad mandate. These varied factors, considered together, show that Local Law 11 changes the method of electing local officers, as the City Council acknowledges in the text of the law itself (see Ch 46-A, § 1057-aa [a]). While the City of New York can exercise its home rule authority to enfranchise noncitizen "municipal voters," as provided by Local Law 11, the People of the City of New York must adopt this method of nominating and electing its public officers by referendum (Municipal Home Rule Law § 23 [2] [e]). No referendum has been held, and therefore Local Law 11 is null and void.
VI.
Conclusion
This appeal is not about whether enfranchising noncitizens to vote in municipal elections is good policy. That is a political question expressly reserved for local legislative bodies. This appeal is instead about the "private affairs" of New York's local governments. Until the majority's decision here, this Court had uniformly recognized the primacy of home rule. To that end, restrictions on local control can only be achieved by express constitutional or state statutory limitations on the exercise of local authority over local elections, and not by implication. There is no such express prohibition on local enfranchisement of noncitizens. To reach its conclusion that Local Law 11 is unconstitutional, the majority rewrites Article II, section 1, rejecting its plain text. The majority's approach also ignores Article IX's mandate that local government "[r]ights, powers, privileges and immunities" "shall be liberally construed." In so doing, the majority diminishes the power of localities statewide.
Control over how a local official is elected and a local referendum is approved is a core concern of localities. Usually, local officers can exercise that control on their own, but sometimes, the people of a locality must make the choice themselves. This is one of those times.
Order insofar as appealed from modified, without costs, in accordance with the opinion herein and, as so modified, affirmed. Opinion by Chief Judge Wilson. Judges Garcia, Singas, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion.
Decided March 20, 2025

Footnotes

Footnote 1: We disagree with our dissenting colleague's view that Local Law 11 violates the Municipal Home Rule Law because it changed the "method" of voting without approval by public referendum. The several provisions cited by our dissenting colleague do not alter the method of voting, but instead extend existing methods of voting to an expanded electorate. Indeed, the dissent's view of what constitutes a change in method appears to depend on how many new voters are enfranchised and how many new ballots need be printed: if, for example, only noncitizens who had continuously resided in New York City for two years were eligible to be "municipal voters," so that only a small number of such persons were enfranchised, it appears the dissent would not consider that to be a change in the method of voting. In any event, an expansion of the electorate does not alter the method of voting (see Stefanik v Hochul, ___NY3d___, 2024 NY Slip Op 04236, *8 [2024] [defining "method" as a "a procedure or process"]).
Footnote 2: Our dissenting colleague offers two responses: a locality would never enfranchise thirteen-year-olds, and if it did, the State legislature can simply amend the Election Law to prohibit the locality from doing so (dissenting op at 25-26). However, the question is not what a locality might do, but what the Constitution allows it to do, and the authority granted to localities under the interpretation proffered by appellants and the dissent is unbounded.
Footnote 3: The exception now in Article II, section 7, allowing for the avoidance of election by ballot for "such town officers as may by law be directed to be otherwise chosen," permits town officers to be elected by a method other than by ballot, such as "the old town meeting fashion of calling for the ayes and noes, or by a show of hands or other division" (People ex rel. Clancy v Board of Supervisors of Westchester County, 139 NY 524 [1893] [discussing 1846 NY Const art II, § 5]). That exception thus does not relate to the meaning of the word "citizen" in Article II, section 1.
Footnote 4: The election at issue in Pease was a county election, which disposes of any argument that Article II does not apply to local elections.
Footnote 5: Appellants' construction also does not sit well with Article III, which repeatedly uses the words "inhabitants" and "aliens" when instructing how legislative districts are to be apportioned (see NY Const, art III, §§ 4 (a), (c) (2); 5; 5-a), but simultaneously restricts the right to sue to challenge those apportionments to "citizen[s]" (id. at § 5).
Footnote 6: Matter of Esler v Walters, relied on by the dissent (see dissenting op at 18) involves a contraction of the right to vote—disenfranchising nonlandholders, not enfranchising
noncitizens—on a local ballot resolution to consolidate two water districts (56 NY2d 306, 312 [1982]). Even in that limited circumstance, we emphasized, citing Spitzer, that Article II, section 1 "does not preclude the Legislature from imposing such a requirement in water district elections" specifically (id. at 314). We also noted that the water district "does not exercise general governmental authority or provide general public services such as housing, transportation, schools or fire and police protection" (id. at 312). That holding has nothing to do with this case.
Footnote 7: Matter of Resnick v County of Ulster, on which appellants rely, is not germane to the issue here. It upheld the constitutionality of a local law providing that a vacancy in a local elective position could be filled by the remaining members of the legislative body, instead of by the Governor, because Article IX, section 2 allowed local governments to provide for appointment of local officers (see 44 NY2d 279, 285 [1978]). Bareham v City of Rochester (246 NY 140 [1927]), also relied on by appellants, does not concern Article II at all.
Footnote 8: The dissent contends that Article II, section 3's use of "persons" rather than "citizens" "would be unnecessary unless someone other than a citizen could be enfranchised by a local law pursuant to Article IX (dissenting op at 15). However, persons who are not citizens are fully capable of paying bribes—or committing any other of the disenfranchising actions listed in section 3. Had section 3 used "citizen" instead of "person" as the dissent suggests, "citizens convicted of bribery" could be read to permit the enfranchisement of persons who had paid or offered to pay a bribe before they became citizens. The use of "persons" expands the provision as broadly as possible, where "citizen" would fail to do so. 

Footnote 9: The dissent places great weight on the difference between "or" and "and," though in this context, "mean or include" is better read to indicate an equivalence and reference to the term of art. We have repeatedly recognized that "[t]he word 'or' in the phrase quoted may be read as 'and' to carry out the legislative intent" (Dept. of Welfare of City of N.Y. v Siebel, 6 NY2d 536, 545 [1959]; see also Hale v Sweet, 40 NY 97, 100 [1869]).
Footnote 10: Article II, section 1 of the 1821 Constitution distinguished between "citizen[s]" and "citizen[s] of this state" in recognition of the fact that New York had not as of that date entirely abolished slavery and it imposed additional durational and other requirements on free people of color (see 1821 NY Const, art II, § 1 ["Every male citizen of the age of twenty-one years, who shall have been an inhabitant of this state one year . . . shall be entitled to vote . . . but no man of colour, unless he shall have been for three years a citizen of this state [and meets certain other requirements]. . . shall be entitled to vote"] [emphasis added]).
Footnote 11: In the immediate aftermath of the Civil War, as it was drafting the Civil Rights Act of 1866, Congress invited a former U.S. representative and prominent lawyer, Horace Binney, as an expert on the meaning of "citizenship" in American constitutional law. He observed, "The word citizen is found ten times at least in the Constitution of the United States, and no definition of it is given anywhere" (quoted in Eric Foner, The Second Founding at 3 [2019]). Although the Fourteenth Amendment granted citizenship, citizenship did not then convey voting rights—that grant had to await ratification of the Fifteenth and Nineteenth Amendments.

Footnote 12: Additionally, appellants' argument accounts for neither the timing nor context of the different usages in our Constitution. For example, intervenors contrast Article II, section 1's use of "citizen" with Article III, section 7's use of "Citizen of the United States" to infer some important difference in meaning, without acknowledging that the former entered our Constitution long before the Fourteenth Amendment provided that all citizens of the United States were also citizens of the state in which they reside, and the latter entered long after the Fourteenth Amendment was adopted.
Footnote 13: The resolution's opponents did not assert otherwise; instead, they "thought that it was outside the province of the Convention to suggest an amendment to the Federal Constitution which would have the effect to change the status of foreign born persons in sister states," and "that it was improper for New York to criticize the Constitutions of other states in this respect" (id. at 77).
Footnote 14: Under other circumstances, I might limit my discussion to what I conclude is the sole ground to nullify Local Law 11, but several reasons make it necessary to address the other challenges plaintiffs raised below. First, the Municipal Home Rule Law presupposes the lawful exercise of home rule authority. Stated differently, only a proposal consistent with the State Constitution and State law may be put to the people by referendum. Second, because the majority resolves this appeal based on its erroneous interpretation of both Article II, section 1 and Article IX, and its reasoning has statewide implications for how localities may exercise their home rule authority in the future, I think it prudent to explain why I disagree with the majority's constitutional analysis. Third, although plaintiffs did not cross-appeal the Appellate Division's rejection of their Election Law claim, my explanation that the Election Law may only preempt a local election law by explicit language supports my broader point that only a clear, direct restraint can limit home rule authority.

Footnote 15: See NYC Mayor's Office of Immigrant Affairs, 2023 Annual Report on New York City's Immigrant Population and Initiatives of the Office, 
https://www.nyc.gov/assets/immigrants/downloads/pdf/MOIA-Annual-Report-2023_Final.pdf [accessed February 21, 2025]).

Footnote 16: Intervenors are several New York City residents who allege they satisfy the Local Law 11 criteria for designation as municipal voters.

Footnote 17: This reading of Article IX, section 3 (d) (3) also aligns with Article II's deployment of the words "persons" and "voters" as potentially broader categories than citizens in section three, five, and seven. Additionally, the majority's claim that Article IX uses the term "people," rather than "citizens," because "no one is a citizen of Westchester County, Rochester or any other locality" (majority op at 14) relies on an overly rigid reading of the text. If Article IX, section 1 (a) stated, "[e]very local government . . . shall have a legislative body elective by the citizens residing therein," no one would think that it refers to a "citizen of Westchester County." Rather, one would read the provision as applying to citizens who reside within the jurisdiction of a local government. The majority ignores our basic rule of construction that "[w]hen different terms are used in various parts of a statute . . . it is reasonable to assume that a distinction between them is intended" (Albano v Kirby, 36 NY2d 526, 530 [1975]). Given how easily the framers could have written Article IX to avoid the potential confusion the majority raises, while still using the term "citizen" to align with Article II, section 1, we must assume that they meant something more meaningful than that when they used the term "people."

Footnote 18: The majority claims that "[w]e have repeatedly recognized" that the word "or" may mean "and" to carry out legislative intent (majority op at 17 n 9). However, the majority does not cite a case holding that this same analysis applies to the State Constitution. The majority also ignores Article IX, section 3 (c), which requires the broadest possible reading of the term "people" to effectuate home rule authority. In any event, the majority's analysis fails on its own terms, because its cited caselaw makes clear that this purported rule does not uniformly apply (see Hale v Sweet, 40 NY 97, 100 [1869] [articulating the rule that "or" may mean "and" in some contexts but deeming that rule inapplicable to the facts of the case]).

Footnote 19: As to the majority's claim that "means and includes" is "similar to legal and colloquial expressions like 'whether or not' " (majority op at 16), there is no reason to abandon our longstanding tools of construction to interpret a document as formal and difficult to amend as the State Constitution based on an ostensible similarity to colloquialisms. The majority cites no support, and it cannot, for the proposition that the same informal and redundant language that may acceptably be used in speech, legal motions, or some statutes may also be used in the State Constitution.

Footnote 20: My analysis does not require that I decide the meaning of the term "citizen" for the purposes of Article II, section 1, or whether that provision applies only to state elections. By enacting Local Law 11, the City Council sought to enfranchise people whom it assumed are not entitled to vote in local elections based on the language in Article II, section 1. Defendant intervenors hold that same view and contend that Local Law 11 authorized them to vote in municipal elections. Plaintiffs argue that Article II, section 1 limits voting to United States citizens and therefore precludes the City from enfranchising "municipal voters" as defined by Local Law 11 to vote in local elections. Because I interpret the State Constitution as permitting localities to expand the franchise beyond those whom Article II, section 1 guarantees the right to vote, it does not matter for the purposes of my analysis whom Article II, section 1 covers.

Footnote 21: The majority is correct that the exception in Article II, section 7 for election of "town officers" does not expressly relate to the term "citizen" in Article II, section 1 (see majority op at 5 n 3). Its observation does not change the analysis. Indeed, the various provisions of Article II are all consistent with localities enfranchising noncitizens in local elections. No portion of any provision in Article II supports a reading of section 1 as imposing a ceiling on who may vote in local elections.

Footnote 22: The majority places undue emphasis on Spitzer's citation to the 1894 Constitution's Article XII, section 1, which required the legislature to "restrict [a locality's] power of . . . borrowing money . . . so as to prevent abuses in . . . contracting debt," to paint Spitzer's holding as narrower, and more constrained to local finances, than its plain language supports (see majority op at 10). If the Spitzer Court intended to limit its rule to financial concerns related to Article XII, section 1, it would have said so. Instead, it repeatedly used the term "private affairs" to describe a separate sphere in which localities have freedom to determine voter qualifications (see 172 NY at 289-290).

Footnote 23: The majority's efforts to distinguish one of these cases, Matter of Esler v Walters, 56 NY2d 306 (1982), on the basis that it only concerned a referendum about consolidating two water districts, cuts against its own argument that Spitzer is limited to issues related to debts given its citation to the 1894 Constitution's Article XII, section 1 (see majority op at 10 n 6, 11). Moreover, while the Court in Esler observed that the consolidated water district "does not exercise general governmental authority or provide general public services such as housing, transportation, schools or fire and police protection," it presumably considered these factors relevant because voter eligibility was limited to landowning residents, which may have raised equal protection concerns in another context (see 56 NY2d at 312-314). The majority elucidates no principle to explain how some matters are sufficiently local to fall within Spitzer's rule for "private affairs" while others are not, even though we have affirmed that the governmental affairs of a locality are not an issue of statewide concern (see Resnick, 44 NY2d at 285-288).

Footnote 24: In Hopper, the challenged law "had made it difficult for those who wanted to vote for one candidate and easy for those who desired to vote for another" (Johnson, 274 NY at 423). 

Footnote 25: See e.g., Pub. Health Law § 2504 (authorizing parents to give consent for medical, dental, health, and hospital services for their child, and reserving that child's right to provide sole consent for such services until they turn 18); Mental Hygiene Law § 33.21 (b) (requiring the consent of a parent or guardian to provide mental health services to a minor, subject to narrow and enumerated exceptions); Domestic Relations Law § 7 (1) (voiding any marriage where either party is under 18); Education Law § 3205 (1) (a) (requiring minors six to 16 to attend full-time educational instruction). We therefore need not worry about the majority's hypothetical world in which adults control where minors live and go to school, significant aspects of their medical treatment, and whether they can marry before 18 years of age, but nevertheless will grant them the right to select the mayor, public advocate, comptroller, borough president and city council member and the right to vote on public referendums.

Footnote 26: The majority inaccurately claims that my interpretation of the constitutional grant of home rule authority is "unbounded" (see majority op at 5 n 2). As explained supra, Article IX authorizes localities to "adopt local laws" (NY Const, art IX, § 1 [a]). At the same time, it empowers the State to "act in relation to the property, affairs or government of any local government . . . by general law" (id. § 2 [b] [2]; see also id. § 3 [d] [1] [defining a "general law" as "[a] law which in terms and effect applies alike" to all localities]). Thus, as the Municipal Home Rule Law concisely states, "every local government shall have power to adopt and amend local laws not inconsistent with any general law relating to its property, affairs or government" (Municipal Home Rule Law § 10 [1] [i]). The State may therefore enact general laws regarding elections, including prohibiting 13-year-olds to vote, without infringing upon home rule authority. The point is that where, as here, the State has not enacted an absolute prohibition against localities enfranchising noncitizens to vote (see Section IV, infra), localities may use their home rule authority to enfranchise noncitizens in local elections.

Footnote 27: The majority also provides no support for its bald proposition that during the 1894 Constitutional Convention, there was a "common understanding that the New York Constitution restricted the franchise to U.S. citizens" (majority op at 21-22).